STATE of Missouri, Respondent,

v.

Ronald Lee WILEY, Appellant.

No. 58613.

Supreme Court of Missouri,
En Banc.

April 14, 1975.

Richard E. Snider, Cape Girardeau, Peter L. Statler, Jackson, for appellant.

John C. Danforth, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

PER CURIAM:

## I.

### The Facts

Appellant was arrested, charged and convicted of two counts of possession of controlled substances in violation of Chapter 195, RSMo 1969, V.A.M.S., in the circuit court of Cape Girardeau County. Punishment was assessed at five years confinement on each count with the sentences to run concurrently. On appeal, the Court of Appeals, St. Louis District, affirmed in an opinion by Judge Simeone; and, then transferred the cause to this court pursuant to Rule 83.02, V.A.M.R., "because of the general interest or importance of a question involved in the case."

That opinion without benefit of quotation marks follows:

On March 10, 1972, Ronald Wiley and Keith Umfleet were charged in a two count information with willfully, unlawfully and feloniously having "in their joint possession a controlled substance"—three bottles of morphine sulfate and 50 capsules of Fiorinal with Codeine #1. The cause was severed. Defendant Wiley filed a motion to suppress the evidence alleging that the search and seizure conducted by the officers violated his constitutional rights; he also filed a motion to "surpress" [sic] statements, confessions or admissions made by him.

On December 1, 1972, a hearing was held on the motions to suppress. The motions were overruled and trial commenced before the court and the jury.

This case presents a great dilemma confronting modern society—that of a conflict between the privacy of individuals and their guests in a private home and the ferreting out of illegal drugs and the enforcement of the laws relating to the possession of controlled substances, the possession of which is declared by our General Assembly to be illegal and detrimental. How to balance these two societal goals—the protection of the privacy of the home and the enforcement of the drug laws is the difficult task we must resolve.

During the afternoon of February 2, 1972, at about 3:30–3:45 p. m., a telephone call came in to the police department of Cape Girardeau, Missouri, on what is known as the "tip" line, a line provided for the citizens of the community wherein informants may call a particular number and inform the police concerning crime, and especially crimes involving drug offenses. The informant in this case was anonymous. Lieutenant William Stover of the Cape Girardeau Police Department spoke to the individual making the tip who told him the following:

(1) That the third floor apartment at 215 N. Ellis Street was rented to Mr. and Mrs. Gary Moore.

(2) That "Keith Umfleet, Ronald Wiley and a Gary Moore had drugs stored in the refrigerator at the third floor north apartment 215 North Ellis" in Cape Girardeau.

(3) That "they were eating a meal there at that time and after they finished the meal they were going to go to Carbondale [Illinois], to dispose of the drugs."

(4) That "there was a Volkswagen car located at the rear of the apartment building and they weren't sure whether this was going to be their transportation to Carbondale or not because it had been giving them trouble."

(5) That an incinerator was located in "the back of this apartment."

This first telephone call lasted about three minutes.

Based upon this information Lieutenant Stover went to the prosecuting attorney's office and at some point verified certain of the information of the caller. Lieutenant Stover verified (1) that the apartment was rented to Mr. Moore, that Mr. and Mrs. Gary Moore lived in the apartment mentioned by the caller, and that it was rented

to them, (2) that there was a red Volkswagen there, (3) that there was an incinerator in the back of the apartment, and the location of the incinerator. Lieutenant Stover had knowledge that Keith Umfleet had a reputation of trafficking in drugs and that he was arrested during a May 12th drug raid in Scott County and that the defendant Ronald Lee Wiley had the general reputation in the community as a "user and supplier of drugs" which reputation was obtained from "competent informants," but he did not know of "any tangible acts" on the part of Wiley which would lead to this reputation.

At least one more telephone call from the informant was received. Stover stated that, after a report from Officer Albert C. Moore of the Police Department who had been assigned to "stake out" the apartment at about 4:30 p. m., one David Hill was "seen in and about that apartment"; that the informant stated that a sale had just been made. Officer Moore, however, testified that David Hill was seen by him to "walk down Broadway in front of the telephone building."

Lieutenant Stover, shortly thereafter, went to the prosecuting attorney's office for the purpose of obtaining a search warrant. At about 4:00 p. m. the prosecutor attempted to contact two judges to obtain a search warrant but the attempt was unsuccessful. Lieutenant Stover testified that the usual time necessary to obtain a search warrant was an hour and a half to two hours. At that time the prosecutor and Lieutenant Stover were in the process of preparing affidavits to present to a judge.

Officer Moore, while parked on a parking lot near the apartment from about 4:50 to 5:30 p. m., did not see any of the persons named in the informant's call enter or leave the apartment, but did see David Hill, a known user of drugs, walk down Broadway in front of the telephone building presumably "in and about that apartment" and he also observed an orange Pinto with Illinois license plates pull into the parking lot, the occupants of which "looked at the front of the apartment building real close and started what appeared to look for a parking place when they spotted me. They then left in a very big hurry."

At about 5:30 p. m., Lieutenant Stover and Officer Moore and three deputies of the sheriff's office—Lieutenant Walter Kinder, Deputies Jim Green and David Gaither—went to the apartment at 215 North Ellis. No search warrant had been obtained and the officers had neither an arrest nor search warrant in their possession.

Three of the officers—Stover, Officer Moore and Deputy Kinder—went to the front door and Deputies Green and Gaither went to the back door of the apartment. Either Lieutenant Stover or Deputy Kinder knocked on the front door; the door was opened by a person inside, the officers announced that they were police officers, and Deputy Kinder stated they were under arrest for the possession of controlled substances and advised them of their rights. At the time of the entry the evidence indicated that, except for Gary Moore who was just inside the door, the individuals were seated on couches and chairs in the living room. Later, Gary Moore followed the officers to the doorway of the kitchen and at the time of the seizure he was standing there. Lieutenant Stover walked through the living room to the kitchen and admitted Deputies Green and Gaither through the back door. Immediately thereafter Stover "opened the refrigerator in the kitchen" and removed a "white plastic bag of drugs from the lower compartment of the refrigerator." The bag was a white zipper top plastic bag about eight by ten inches in size containing glass bottles. When Lieutenant Stover came in, he went "straight to the back door and then straight to the ice box." This took no more than "a couple of minutes." The individuals in the apartment were not searched and no other search of the place was made.

The individuals were then taken to the police station.

The sheriff of Cape Girardeau County, Sheriff McLain, testified on both the motion to suppress and before the jury. He testified that after the defendant was arrested, the defendant went to a hospital but later, on February 16, 1972, when he was returned to jail, the defendant told him he wanted to speak to him—the sheriff. The sheriff and the prosecutor did speak to the defendant in the sheriff's office. No promises were made, the defendant was advised of his constitutional rights, he initiated the conversation, no threats were made, he was not under the influence of alcohol or drugs, he was mentally alert, and in this conversation the defendant told the sheriff that "I know about them drugs that was in that refrigerator." The sheriff testified that the defendant stated that the drugs were "Keith's [Umfleet] and someone else's, his and Moore's, his and Keith's, I believe." The defendant stated that "him and Keith went up in Detroit and got them," and that "they had to keep them over there [in the apartment] because Keith's trailer was too hot to keep them in."

A report of the conversation made by the sheriff was introduced. That report stated that Wiley "stated that he knew the dope was in the refrigerator and that he has helped Kieth [sic] sell it before and he got his own supply by helping to sell to others . . . He [Wiley] also stated they kept the stuff in Moore's house instead of Umfleet's housetrailer because Umfleets Housetrailer was hot."

During the State's case, Dr. Robert C. Briner, a chemist and director of the criminalistics laboratory at Southeast Missouri State College in Cape Girardeau, testified. He first testified that morphine sulfate is a controlled substance under Missouri law, and that it is a scheduled drug. He said while morphine sulfate is not listed in schedule I of the statute, it is one of the derivatives of morphine which is listed in schedule I. He said that morphine sulfate is a salt of morphine. The bottles taken at the apartment were sealed and of the type

"that would normally occur in hospital type pharmacies." They were labeled morphine sulfate. Tests resulted in confirming the presence of morphine, and "we determined it as morphine and not morphine sulfate. . . . Morphine was present in those three bottles" and morphine, in his opinion is listed in schedule I.

As to the 50 capsules, the possession of which was charged in the information, Dr. Briner testified that upon tests they were a "barbituric acid derivative with codeine present" and schedule 3 of the statute (§ 195.017) lists a "derivative of barbituric acid, or any salt of a derivative of barbituric acid," which is a schedule three drug. "Fiorinal with codeine No. 1" is a trade name.

On redirect examination, Dr. Briner stated that the substance in the three bottles can be a "derivative of morphine methylbromide" and the 50 capsules are derivatives of barbituric acid. After his testimony, the court was requested to and did take judicial notice of §§ 195.017(3) and 195.017(6)(3)(a), RSMo 1969, V.A. M.S.

The defendant moved for a directed verdict which was overruled.

After instructions and argument, the jury returned a verdict of guilty on both Counts I and II and assessed defendant's punishment on Count II at five years but the members of the jury were unable to agree on the punishment on Count I. On January 5, 1973, the court fixed the punishment on Count I at five years to run concurrently and after the motion for new trial was overruled and allocution afforded, sentenced the defendant to the department of corrections.

The defendant, having been given leave to appeal as a poor person, appealed.

## II.

### The Contentions

Appellant contends on appeal that the conviction should be reversed because (1)

the motion to suppress the physical evidence should have been sustained and the evidence excluded since there was no probable cause to arrest the appellant, that the search and seizure was in violation of appellant's constitutional rights, no search warrant having been obtained, and the search, even if incidental to an arrest was overbroad, (2) that the evidence was insufficient to make a submissible case and that the court erred in overruling his motion for a directed verdict since he was not in exclusive possession or joint control of the premises, hence the state must prove knowledge of and actual control of the prohibited substance, and (3) the court erred in overruling the motion for directed verdict because the state failed to prove the existence of the substances charged or that they were prohibited and illegal substances under Missouri law.

As appellant states in his brief, the basic issues on this appeal are (1) whether the officers who searched the apartment without a warrant had reasonable grounds to arrest appellant before entering the apartment, and (2) if so, whether the search and seizure of the materials from the kitchen refrigerator was incidental to that arrest and admissible in evidence and whether the search and seizure was within the bounds of a lawful seizure and not overbroad when the seizure took place in the kitchen, the defendant having been arrested in another room of the apartment—the living room, (3) whether the appellant is subject to criminal responsibility when he was not in exclusive or joint control of the premises, and (4) whether the state charged and proved the existence of prohibited substances.

III.

*The Legality of the
Arrest*

 The evidence to be admissible in this case must be the "product of a search incident to a lawful arrest, since the offi-cers had no search warrant. The lawfulness of the arrest without warrant, in turn, must be based upon probable cause, which exists 'where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.' Brinegar v. United States, 338 U.S. 160, 175, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, 1890 (1949), quoting from Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543, [555], 39 A.L.R. 790 (1925)." Ker v. California, 374 U.S. 23, 34–35, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963).

 Whether there was probable cause to arrest the appellant along with others in the apartment depends on the information in the officers' possession prior to the arrest. Of course, all the information in the possession of the officers and all reasonable inferences therefrom are pertinent to determine probable cause. Whether there is justification for probable cause to arrest without warrant must be determined by practical considerations of everyday life on which reasonable men act and is not to be determined by hindsight by legal technicians. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). The determination of probable cause depends upon the particular facts and circumstances of the individual case and no ready "litmus paper test" can be applied. Probable cause may be based on hearsay. There is a broad gulf between what is required to prove guilt and the requirement of probable cause. We deal here with controlled substances. In such cases officers may well have to depend on informers, special employees and on their own special experience. United States v. Kancso, 252 F.2d 220 (2nd Cir. 1958).

 The arrest here was based on an anonymous informer's tip which came in on the community's tip line. Whether an arrest may be made upon the tip of an in-

former has caused great confusion in the courts. On the one hand to authorize law enforcement officers to arrest a citizen and enter his home on the strength of an anonymous "tip" would make a mockery of the Fourth and Fourteenth Amendments. A tip may be a prevarication, a malicious statement or the work of the local busybody. To hold true to the principles of our Federal and State Constitutions, an arrest, invasion and search and seizure upon a mere tip of an informer cannot be countenanced. On the other hand, to deny law enforcement officers the power to arrest, search and seize based upon such information may result in serious consequences and the inability of such officers to ferret out criminal activity in the community and to control dangerous substances. A balance must therefore be struck. The proper test is that an officer may rely on information received through an informant, rather than on direct observation "so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge" and there is a substantial basis for crediting the hearsay. Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960). In *Jones,* it was held that a guest of the owner of the premises had standing to complain of the search and seizure of narcotics found in a room in which he was present. "No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him." 362 U.S. at 267, 80 S. Ct. at 734. In re J. R. M., 487 S.W.2d 502 (Mo. banc 1972); State v. Ross, 438 S.W. 2d 8 (Mo.1969). *Jones* also held that there

was substantial basis for a search warrant based on an informant's information when the information was corroborated by other sources which reduced the chances of a reckless or a prevaricating tale. As long as there is a substantial basis for crediting the hearsay, the information is not to be deemed insufficient.

In Draper v. United States, *supra,* an arrest was upheld without a warrant solely upon the informant's statement that the defendant was peddling narcotics, as corroborated by the fact that the informant's description of the defendant's appearance and of where he would be on a given morning, matters which of themselves are totally innocuous, agreed with the officers' observations.

■ There is no absolute requirement that the informant be one of previous reliability. United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).[1]

■ The true inquiry therefore is whether the informant's present information is reliable. As long as the corroboration of the information through other sources, even though the matters are innocuous, reduces the chances of a "reckless or prevaricating tale," the information, even though hearsay, may form the basis of probable cause for an arrest.

■ Under the evidence in this proceeding we believe that there was probable cause to arrest the occupants including appellant at the apartment at 215 North Ellis. The information provided by the informant was specific—that certain persons were in the apartment, that drugs were in the refrigerator, that the persons were eating a meal, that when they finished, they were going to Carbondale to dispose of the

---

1. Appellant relies on Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Whiteley v. Warden of Wyoming State Penitentiary, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). *Aguilar* involved a search warrant based on an affidavit without some of the underlying circumstances from which the officer concluded that the informant was credible. *Whiteley* involved a warrant of arrest; the complaint on which the warrant issued could not support a finding of probable cause once the arresting officer did not possess any factual data tending to corroborate the informer's tip. These cases are not determinative here. Compare *Aguilar, supra,* with United States v. Harris, *supra.*

drugs, that there was a Volkswagen at the rear, and that a sale had been made. The officers did not merely rely on the information, but verified much of the information and were aware that the persons named were users or suppliers of drugs. The officers verified that the apartment was rented to Mr. and Mrs. Moore, that they resided at that address, that the defendant, Umfleet and Hill had a reputation relating to drugs, that a particular automobile was parked at the apartment and that Hill, a known user of drugs was seen about the apartment—matters innocuous in themselves. An effort was made to obtain a search warrant but a judge was not available, and Lieutenant Stover said that in his experience it takes about an hour and a half to two hours to obtain one. The whole episode took about two hours from the time that the informant first called to the time the officers entered the apartment.

Under all the circumstances, we believe there was probable cause to make the arrests.

## IV.

### The Validity of the Search

We turn to the issue whether the arrest having been made upon probable cause, the search and seizure of the controlled substances in the refrigerator was permissible.

 The Fourth Amendment as applicable to the States protects the right of the people to be secure in their residences by providing that search warrants shall be obtained upon probable cause supported by oath or affirmation. Despite the clear preference of the law for searches authorized by search warrants and despite the general principle that in order to search and seize, a warrant is to be obtained from a neutral and detached magistrate, there have been carved out a few well-delineated exceptions. One well-recognized exception is that a search may be made of the person and the immediate area when the search is incident to a lawful arrest. Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925).

In United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the Supreme Court of the United States held, "It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment."

But when we deal not with a search of the person, but with the immediate area, there are recognized limitations.

In Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), police officers armed with a warrant of arrest but no warrant to search went to the defendant's home and searched the house of the defendant. The Supreme Court held the search invalid, stating: "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. . . . In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. . . . There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

"There is no comparable justification, however, for routinely searching any room other than that in which the arrest occurs —or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. . . ." 395 U.S. at 763, 89 S.Ct. at 2040.

In finding the search incident to an arrest unjustified, the Supreme Court further stated, "The search here went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. . . . The scope of the search was, therefore, 'unreasonable' under the Fourth and Fourteenth Amendments and the petitioner's conviction cannot stand." 395 U.S. at 768,[2] 89 S.Ct. at 2043.

When the arrest took place in this case, the individuals were in the living room, and later Gary Moore followed the officers to the doorway of the kitchen. There is no showing that the persons were so near the refrigerator that the search and seizure of the controlled substances could be a lawful search incident to the arrest.

We are compelled to hold under the authorities that when a search and seizure is made incident to a lawful arrest and no search warrant is obtained, the search may be made of the arrestee's person and the area within his immediate control, meaning that immediate area from within which the arrestee might gain possession of a weapon or destructible evidence. Pursuant to *Chimel, supra,* and the other authorities, we believe the search was, under the record here, beyond the area of permissible search and was overbroad.

However, we do not believe that *Chimel, supra,* disposes of the case before us.

The circumstances contained in this record are such that the search here may be justified within another well-recognized exception to the search warrant requirement. That exception to the warrantless search is that of exigent circumstances. When there are certain "exigent circumstances," a warrant for search may be dispensed with. Johnson v. United States, 333 U.S. 10, 14–15, 68 S.Ct. 367, 92 L.Ed. 436 (1943); McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951) (recognizing principle).

This exception was thoroughly discussed in United States v. Rubin, 474 F.2d 262 (3rd Cir. 1973), a controlled substances case. That case involved a situation where there was reason to believe a quantity of hashish in a dwelling was threatened to be removed or destroyed. The court traced the cases dealing with the exception, and concluded that "when . . . agents, however, have probable cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified." 474 F.2d at 268. The court listed a number of relevant circumstances to determine when the doctrine may be applied and among the number included a "reasonable belief that the contraband is about to be removed." 474 F.2d at 268. The court upheld the warrantless search.

2. In Cupp v. Murphy, 412 U.S. 291, 93 S.Ct. 2000, 2004, 36 L.Ed.2d 900 (1973), the Supreme Court has reemphasized the language in *Chimel* indicating that a warrantless search incident to an arrest is limited to the area "into which an arrestee might reach." 93 S.Ct. at 2004. Other jurisdictions have similarly held such searches to be beyond the scope of the permissible area. United States v. Mapp, 476 F.2d 67 (2nd Cir. 1973) (where *closet was closed and officer was between it and defendant*); Hunter v. State, 127 Ga. App. 664, 194 S.E.2d 680 (1972) (search is not permissible as incident to arrest when it is not conducted in an area within the arrestee's immediate control, an area so contiguous that he might gain control of a weapon or destroy evidence); People v. Williams, 11 Ill.App.3d 1038, 297 N.E.2d 783 (1973) (weapon concealed on kitchen shelf, ten feet from accused was not considered an area within immediate control); Norton v. State, 501 P.2d 877 (Okl.Cr.App.1972) (defendant confined in police car, search of his empty car beyond area).

Compare *Chimel* with State v. Carenza, 357 Mo. 1172, 212 S.W.2d 743 (1948) and State v. Ciarelli, 416 S.W.2d 944 (Mo.1967).

The evidence in this record shows that the officers and the prosecutor were in the process of preparing papers in order to obtain a warrant. Lieutenant Stover testified that it takes a period of time to prepare the papers and obtain a warrant; the officers had information that the parties would soon leave the apartment after the meal was finished in order to proceed to Illinois in order to sell the substances. The whole episode from the time of the first information to the time the officers knocked on the door of the apartment took about two hours. When the officers entered the apartment, Lieutenant Stover went directly to the refrigerator and took out the controlled substances.

We do not believe *Chimel* and its progeny control the situation here. The thrust of *Chimel* was that the arrest of a person at home could not justify a routine search. *Chimel* did not involve a situation where the officers, having certain information, searched a particular area for particular evidence. In *Chimel*, there was no indication of circumstances which indicated to the officers that removal or destruction of the evidence was imminent or threatened. Nowhere in the opinion does the Court suggest that exceptional circumstances existed by which evidence was threatened to be removed or destroyed.

In this case there was evidence that such circumstances existed when the officers had to determine whether to proceed without warrant or wait until a warrant could be obtained. Under all the evidence we believe that the exceptional circumstances existed and therefore the search and seizure of the controlled substances was not an unreasonable one—the ultimate test under the Constitution as to whether the search and seizure was impermissible.

Appellant relies on State v. Funk, 490 S.W.2d 354 (Mo.App.1973) where the Kansas City District held that a search of the residence of the defendant, including a dresser drawer in the bedroom, was unjustified. Relying on *Chimel*, the Court held the search and seizure of drugs was impermissible. *Funk* is distinguishable. In *Funk*, (1) the search was not sustained because the search preceded the arrest, thus violating the "classic statement of the exception permitting a warrantless search incidental to an arrest includes a flat requirement that the arrest precede the search in point of time," 490 S.W.2d at 358; (2) the officers entered the house for the precise purpose of making a search, not for the primary purpose of making an arrest; and (3) a thorough search was made of the entire house, as well as the dresser in the bedroom where the defendant was present and drugs were found.

Here the search of the refrigerator was made subsequent to an arrest and there was no search of the entire premises. There was not even a search of the persons in the residence. The officers went directly to the refrigerator and seized the controlled substances.

The validity of the search and seizure in these limited circumstances may be sustained upon another ground. An analogy can be made to those decisions in which officers are entitled to take a suspect to a victim of an offense for immediate viewing and an immediate confrontation. In Grant v. State, 446 S.W.2d 620 (Mo.1969) for example, in such a situation, our Supreme Court stated, "The officers had the responsibility of ascertaining the identity of the criminal. Their attention having been directed to appellant, and he having been taken into custody, it was important in those early moments of the investigation that he either be detained as the suspect or released and the investigation continued . . . ." 446 S.W.2d at 621.

In the case at bar, the officers had information concerning a violation of the law; much of the information was verified and much of it was innocuous. The key information was the specific location of the controlled substances in the refrigerator. As in *Grant, supra*, and other decisions, it was important in these early moments after the arrest that the defendant

and others either be detained or released and the investigation continue, if the information concerning the location of the substances proved to be false. It was reasonable therefore for the officers to immediately examine the one location to which their attention had been directed to verify the accuracy of the information.

We hold, therefore, under the restricted fact situation here, that when the informant provided information concerning the exact location of the substances, a search of that location was not unreasonable. We do not, however, determine that had the information of the location of the substances been more general, such as in the apartment, that a search of the entire apartment or even of the entire room would have been warranted without a search warrant. We merely say that under the restricted circumstances here we do not find the action of the officers to have been unreasonable.

Under the totality of the circumstances presented in this record, we cannot conclude, therefore, that the search and seizure of the controlled substances found in the refrigerator was an unreasonable one.

## V.

### The Sufficiency of the Evidence

The appellant next raises the issue that the motion for a directed verdict should have been sustained for the reason that absent exclusive possession of the premises or joint control, the state failed to make a submissible case to convict the defendant.

■ In reviewing the evidence, we must view the evidence in the light most favorable to the state and give the state the benefit of all reasonable inferences.

■ In narcotics or controlled substance cases, the law has developed the policy that a person in exclusive control of the premises will be deemed to have possession and control of the substance found on the premises. The basis for this infer-

ence has recently been stated in State v. Funk, *supra,* at 360, quoting from People v. Nettles, 23 Ill.2d 306, 178 N.E.2d 361, 363 (1961). " * * * Human experience teaches that narcotics are rarely, if ever, found unaccountably in a person's living quarters."

■ The same principle that a person may be deemed to have possession of the substance found on the premises may be applied even when the defendant does not have the exclusive control of the premises, since there may be joint control with the same consequences as if there were exclusive control. But, states *Funk, supra,* at 361, if there is joint control then there must be some "further evidence or admission connecting the defendant with the illegal drugs."

■ So under the circumstances here. The defendant was a guest in the Moore apartment. Merely being a guest in the household of another would not be sufficient to sustain a conviction of possession of controlled substances. Where a person is present on premises where drugs are found but does not have exclusive use or possession of the premises, it may not be inferred that he had knowledge of the presence of the drugs or had control, so that no submissible case is made. Additional factors are required. Where the defendant is present on the premises and if there are additional independent factors showing his knowledge and control, then that is sufficient to withstand a motion for a directed verdict. To justify a conviction in any case on a charge of possession it is necessary to prove that the accused knew of the presence of the forbidden substance and that the same was under his control. In the absence of incriminating circumstances *no case is made.*

■ Here, the sheriff testified that on February 16, 1972, the defendant desired to speak to him, that after being warned of his rights, and with no promises or threats being made, the sheriff testified that the defendant stated, "I know about them

drugs that was in that refrigerator" and that "It was Keith's [Umfleet] and someone else's, his and Moore's, his and Keith's, I believe." He stated that "him and Keith went up to Detroit and got them." That "they had to keep them over there [Moore's] because Keith's trailer was too hot to keep them in."

This is more than mere evidence of being present on the premises. This evidence raises a jury question as to knowledge and control by the defendant.

We have examined the cases cited by the appellant in his brief. They are distinguishable and not dispositive of the issues here.

We hold that the court did not err in overruling the motion for a directed verdict at the close of the state's case.

## VI.

### The Illegality of the Substances

█ The appellant Wiley's last contention is the court erred in overruling the motion for directed verdict because the state failed to prove the existence of the substances charged or the illegality of the substances, morphine sulfate and Fiorinal with Codeine # 1. We rule this contention against appellant. Dr. Briner stated that derivatives of morphine are listed in schedule I of Chapter 195 and that morphine sulfate is a salt of morphine, that morphine was present in the three bottles and that morphine is one of the drugs listed in schedule I. He stated that the substance in the bottles is a "derivative of morphine methylsulfonate." He also stated that Fiorinal with Codeine No. 1 is a trade name and that the tests performed showed the substance to be a barbituric acid derivative with codeine present and schedule three "says either a derivative of or a salt of a derivative of barbituric acid."

We believe there was sufficient proof to show the illegality of the controlled substances.

## VII.

As other courts have indicated, we do not in any way minimize the importance of the Fourth Amendment's protection "in shielding the citizen from unwarranted [and unreasonable] intrusions into his privacy." United States v. Rubin, 474 F.2d at 270. We decide only the facts of this case. The circumstances presented in this record are sufficiently compelling to protect societal interests. Under the totality of the circumstances and having examined the record, the briefs, the argument and decisions cited by the appellant, we conclude that the judgment should be affirmed.

Reargument of the case in this court focused primarily on the validity of the warrantless seizure of the narcotics from the refrigerator.

The emergency or exigency doctrine was accepted initially by this court in State v. Sutton, 454 S.W.2d 481 (Mo. banc 1970) in a case which factually was far removed from the present one. In that case the deceased, having been shot by his wife and before he died, contacted an ambulance operator and ". . . said that his wife had shot him. That he needed help. To come quickly." The ambulance driver contacted the town marshal, who in turn contacted the sheriff; drove to the deceased's home and found him unconscious; and, delivered him to the hospital. The marshal and sheriff arrived at the home after the ambulance had left. They seized evidence which was later used at trial to help convict the deceased's wife of involuntary manslaughter. This court held that the emergency situation justified the officers' entry into the house and seizure of the evidence which was in plain view in the house. That opinion, in effect, was reversed in Root v. Gauper, 438 F.2d 361 (8th Cir. 1971), wherein the defendant was released on a writ of habeas corpus after a factual finding that an emergency situation no longer existed at the time the marshal and sheriff arrived. However, that court did not reject the doctrine upon

which this court had predicated its finding.

Thereafter, in United States v. Blake, 484 F.2d 50 (8th Cir. 1973), cert. denied, 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669 (1974), the court upheld a warrantless search and seizure involving narcotics. In that case federal agents went to the apartment of one Willie Vales with a warrant for his arrest. One of the agents knocked on the front door of the apartment and identified himself and the purpose for his presence, and then forcibly entered. While the foregoing was occurring one of the other agents, stationed below the balcony at the rear of Vales' apartment, observed the defendant Blake step out onto the balcony and begin to throw a white change purse over the side. The agent ordered him to stop and the defendant ducked back into the apartment. The agent who initially entered through the front door saw the defendant in the hallway next to an open clothes chute. The third agent in the arresting party, after entering the apartment, went through a door in the kitchen down a flight of stairs into the basement. He saw a white change purse under an open clothes chute and seized it. He opened the purse and found a plastic bag containing a powdery substance which the agent believed was a narcotic. After all this had transpired, defendant was arrested. The federal agents had neither a search warrant nor an arrest warrant for the defendant (although they did have an arrest warrant for Willie Vales). The 8th Circuit used the exigent circumstances rationale to validate the search and seizure in the case l.c. 54 to-wit:

> Therefore, the question is whether the facts in this case constitute an exceptional circumstance that allowed the warrantless search of the basement. Before the search of the basement and seizure of the white purse, the officers did not have probable cause to arrest the defendant. However, the failure to find and seize the white purse would have lead to a situation in which possible "evidence or contraband was threatened with removal or destruction. . . ." Johnson v. United States, 333 U.S. 10, 15, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). . . . [T]he officers in this case had to find the white purse or risk the probability that contraband would be removed or destroyed. Although the officers here did not see the white purse being tossed down the clothes chute, one officer did see the defendant with the white purse when the defendant reentered the apartment from the balcony porch and another officer observed the defendant in front of the open clothes chute. These facts gave rise to probable cause to believe that defendant might have possessed narcotics and constituted an exceptional circumstance or situation that allowed the warrantless search of the basement and seizure of the white purse.

The second "emergency" case in this state was State v. Miller, 486 S.W.2d 435 (Mo.1972), but it involved going to the aid of another and not the hoped for objective of preserving evidence.

A recent statement of the "exigent circumstances" exception is found in United States v. Davis, 461 F.2d 1026 (3rd Cir. 1972), l.c. 1030, to-wit:

> [I]n certain situations, generally grouped under the heading "exigent circumstances," there need be no warrant. The fourth amendment protects only against unreasonable searches and seizures. It, therefore, requires the police to obtain warrants only when they have time and opportunity to do so without obstructing their efforts to apprehend criminals and the evidence or fruits of their crimes. Therefore, when officers are in "hot pursuit" of a criminal, . . . when they "stop and frisk," . . . or when their attempt to secure a warrant might delay them sufficiently to cause the criminal to get away or destroy the fruits or evidence of his crime, . . . they may proceed without a warrant.

The state in its brief correctly defines the problem, to-wit:

"By its very nature, the 'doctrine of exigent circumstances' is not a rule which courts are able to limit in advance to specifiably detailed concrete situations; but instead, each warrantless search must be determined in the light of the unique circumstances which required it. This is simply a recognition of the fact that law enforcement officers are constantly dealing with infinitely varying circumstances. Because this doctrine is not an arbitrary or flat rule but involves the weighing of the interests of the need for effective law enforcement and the need for a citizen's right to privacy, the circumstances and facts surrounding each warrantless search must be independently examined on a case by case basis to determine if these competing interests have been correctly weighed by the police officers."

Courts have been very reluctant to recognize that circumstances exist in any particular case which would justify a warrantless search. While exercising such restraint, the court of appeals identified the factual situation in this case as one calling for application of the "exigent doctrine." With this we agree.

The judgment is affirmed.

DONNELLY, C. J., and HOLMAN, HENLEY, and FINCH, JJ., concur.

MORGAN, J., concurs in separate concurring opinion filed.

SEILER, J., dissents in separate dissenting opinion filed.

BARDGETT, J., dissents and concurs in separate dissenting opinion of SEILER, J.

SEILER, Judge (dissenting).

Assuming the police had probable cause to arrest the defendant along with the others in the apartment,[1] I respectfully dissent as to the search and seizure portions of the principal opinion on these grounds:

I

The effect of the principal opinion is to allow the police, when they have arrested a defendant on probable cause to believe he has narcotics concealed in his dwelling, to search whatever portion of the dwelling in which they have reason to believe the narcotics are hidden. The justification for this warrantless search is said to be the emergency or exigency found in the possible removal or destruction of the contraband or evidence. The practical consequence is that a warrantless search is authorized in almost every arrest which occurs in a dwelling place, far beyond the limits imposed by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), as it can always be said there is the possibility of removal or destruction of evidence if the police are required to obtain a warrant.

In the case before us, the police arrested everyone in the apartment and took them to the police station. There was no one left in the apartment to remove or destroy the narcotics in the refrigerator. The opinion expressly states the search was made subsequent to the arrest. Yet it is on the basis that the narcotics were going to be removed or destroyed after the arrest that the emergency is found. There is no reason to believe the narcotics would be re-

1. The informant was unknown and therefore had no previous record of reliability, unlike Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) and Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). In addition, unlike United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), there was no clue as to whether he claimed to have come by the important portions of his tip by recent personal observation or merely by rumor or surmise, nor was there any inherent support for what he reported in the nature of a declaration against interest.

moved before a warrant could be obtained, a circumstance required under Coolidge v. New Hampshire, 403 U.S. 443, 460–64, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), for the application of the emergency theory. It would have been simple to have left a policeman on guard while a search warrant was obtained. There is no evidence that any other person had or would be allowed access to the apartment.[2] Under these conditions, it cannot be said that ". . . [the officers'] attempt to secure a warrant might delay them sufficiently to cause the criminal to get away or destroy the fruits of evidence of the crime . . .", United States v. Davis, 461 F.2d 1026, 1030 (3rd Cir. 1972), cited by the principal opinion. An emergency might have existed with respect to the arrest of the persons involved, but once the arrests were accomplished, and it being conceded that the search was not incident thereto, then "Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant." Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925). "That basic rule 'has never been questioned in this Court' . . .", Vale v. Louisiana, 399 U.S. 30, 35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970).

The United States Supreme Court has ruled invalid a search and seizure which closely resembles the facts here, but which is not discussed by the principal opinion. In Vale v. Louisiana, supra, the police, *who were watching* defendant's house, observed what they suspected was a sale of narcotics between defendant and a known addict outside the house, after the defendant had gone into the house and brought something out to the addict. They arrested defendant at the front steps, informed him they were going to search the house, and one of the officers made a cursory inspection of the house to ascertain if any-

one else was present. Within about three minutes, defendant's mother and brother returned home carrying groceries and were informed of the arrest and impending search. A search then made of a rear bedroom revealed a quantity of narcotics. The Court reversed and remanded.

The Court first established that the search was not within the permissible scope of a search incident to arrest, Chimel v. California, supra, and then stated, 399 U.S. at 34–35, 90 S.Ct. at 1972.

"The Louisiana Supreme Court thought the search independently supportable because it involved narcotics, which are easily removed, hidden, or destroyed. It would be unreasonable, the Louisiana court concluded, 'to require the officers under the facts of the case to first secure a search warrant before searching the premises, as time is of the essence inasmuch as the officers never know whether there is anyone on the premises to be searched who could very easily destroy the evidence.' 252 La., at 1070, 215 So.2d, at 816. Such a rationale could not apply to the present case, since by their own account the arresting officers satisfied themselves that no one else was in the house when they first entered the premises. But entirely apart from that point, our past decisions make clear that only in 'a few specifically established and well-delineated' situations, Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576, may a warrantless search of a dwelling withstand constitutional scrutiny, even though the authorities have probable cause to conduct it. The burden rests on the State to show the existence of such an exceptional situation. Chimel v. California, supra, 395 U.S. at 762, 89 S.Ct. at 2039; United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59; McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153. And the record before us discloses none."

2. This being a warrantless search, the burden of proof as to justification is on the state. Vale v. Louisiana, infra; United States v.

Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1950); State v. Witherspoon, 460 S.W.2d 281 (Mo.1970).

The factual similarity between Vale and the case at bar leaves little room for doubt that it is controlling here. In fact, the Supreme Court saw no significance in the possibility that defendant's mother and brother, who were present but not under arrest, might remove or destroy the narcotics, a risk which is lacking here, as all the occupants of the apartment were in custody.

A case which does illustrate circumstances contemplated by the emergency doctrine is Cupp v. Murphy, 412 U.S. 291, 296, 93 S.Ct. 2000, 2004, 36 L.Ed.2d 900 (1973). There the police were investigating the murder by strangulation of defendant's wife. The defendant volunteered a great deal of information, but refused to let police take a sample of scrapings from his fingernails, the police having noticed a dark spot on his finger which they thought might be blood. Upon refusing, defendant put his hands behind him, appeared to rub them together and then put his hands in his pockets and a metallic sound was then heard, such as keys or coins rattling. The police thereupon took the fingernail scrapings over his protest and without a warrant. The scrappings contained incriminating traces which were introduced in evidence against defendant. The Court upheld the search, but on the ground that defendant was attempting to destroy what evidence he could without attracting further attention and hence the police were justified in making the search which was "necessary to preserve the highly evanescent evidence they found under his fingernails." This necessity is missing in our case. The narcotics in the refrigerator, after the occupants of the apartment had been arrested, were not "highly evanescent."

The cases relied on in the principal opinion are cited only for their general language recognizing the emergency doctrine per se, but the facts of those cases are distinguishable, and the principal opinion fails to establish an immediate danger of removal or destruction of evidence under the facts of this case. In United States v. Davis, 461 F.2d 1026 (3rd Cir. 1972), the narcotics were found on the person of the defendant or within the area immediately under the control of the defendants, and all the evidence seized was held to be incident to a lawful arrest under Chimel, id. at 1034. The emergency involved in Davis was pertinent only to the arrest of the defendants and not to the search.

In United States v. Blake, 484 F.2d 50 (8th Cir. 1973), the federal agents virtually saw the defendant throw the narcotics down a clothes chute. The court stated at 54, "The officers could have obtained a search warrant, however the defendant was not under arrest and could have removed or destroyed the white purse [which contained the narcotics]. The delay in obtaining a search warrant could certainly have been fatal." [3]

In United States v. Rubin, 474 F.2d 262 (3rd Cir. 1973), federal agents watched defendants transport a statue which they believed to contain narcotics from the airport to his home. Defendant then left his home and drove several blocks to a gas station where it appeared to the agents he was known to some of the persons present. When arrested, he yelled, "Call my brother." The agents knew that at least one other person, who was not in custody, had been left at the defendant's dwelling, and the court stated at 269, "It was not unreasonable for agents to believe that this might well be a signal to alert persons still

3. The factual situation in the Blake case is also similar to cases where the officers are closing in on a suspect and see him throw an object away. There is nothing unusual in permitting the officers to retrieve the object, as for example in State v. Harris, 325 S.W. 2d 352 (Mo.App.1959), where the officers retrieved the bag which the defendant tossed

onto a nearby roof while the officers were chasing him. This is what the officers would have done in the present case had they seen one of those in the apartment open the refrigerator door and then close it, even though they did not actually see him put anything in the refrigerator.

at 1819 South 9th Street of [defendant's] arrest and of imminent police intervention into their activities . . . ."

The Blake and Rubin cases thus demonstrate emergency situations where there is a very real threat of destruction or removal of evidence by persons not in custody with access to the contraband. In this case, there was no such threat.

The principal opinion establishes much too broad a concept of emergency. If it prevails, then as said by the United States Supreme Court when asked to uphold doubtful police procedures, "If the officers in this case were excused from the constitutional duty of presenting their evidence to a magistrate, it is difficult to think of a case in which it should be required." Chapman v. United States, 365 U.S. 610, 615–16, 81 S.Ct. 776, 779, 5 L.Ed.2d 828 (1961), quoting Johnson v. United States, 333 U.S. 10, 15, 68 S.Ct. 367, 779, 92 L. Ed. 436 (1948).

II

In addition to the emergency theory, the principal opinion states that the search in this case can be sustained upon another ground, to wit: ". . . it was important in these early moments after the arrest that the defendant and others either be detained or released and the investigation continue, if the information concerning the location of the substances proved to be false. It was reasonable therefore for the officers to immediately examine the one location to which their attention had been directed to verify the accuracy of the information." This is certainly a novel justification for a warrantless search. Under this theory no constitutional right of a suspect need be observed if to do so would interfere with a quick determination by the police as to whether they have the man they are after. As to fourth amendment rights it would practically wipe out judicial involvement in the decision as to when the right of privacy must yield to the right of search.

A similar argument was rejected in United States v. Hamilton, 490 F.2d 598, 601 (9th Cir. 1974). In that case, the government tried to justify the warrantless search of a secret compartment in a truck (in which, the agents were told by an informant, they would find marijuana) on the ground that the information provided was thus verified. The court stated, "It is hornbook law that ex post facto verification does not satisfy the Fourth Amendment. Wong Sun v. United States, 371 U. S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)."

The principal opinion sees an analogy to Grant v. State, 446 S.W.2d 620 (Mo.1969), but the analogy is not apt. That was a rape case. The victim ran to a neighboring farmhouse and called the officers. While taking the assailant's description, they received word a man had been seen on a nearby farm. They arrested and brought him back to the victim, handcuffed, for an immediate one-to-one identification confrontation. Under Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L. Ed.2d 1199 (1967), this procedure was held not to violate due process as constituting an unfair identification. As pointed out in the Grant opinion, while the police knew a crime had occurred and they had the defendant in custody, they did not know for sure whether he was the assailant. But in the present case there was no uncertainty about who the participants were if a crime had been committed. They were the people in the apartment. The police were not looking for the narcotics in the refrigerator to decide whether to look for someone other than the people in the apartment. If there were no narcotics in the refrigerator, then it was a false alarm, not a case where a crime had occurred, but the police did not yet have the culprits.

The two cases are not similar but because the procedure approved in the Grant case enabled the police to determine quickly whether they had the right man, it is sought to approve what was done in the present case on the ground that it likewise enabled the police to decide quickly wheth-

er they were right. As said earlier, under this approach no constitutional right would be applicable if it interferes with the police making a quick decision. The short answer to this is that no such exception appears in the fourth amendment.

Under the proposed opinion, the overriding consideration in fourth amendment cases becomes helping the police in bringing crime investigations to a conclusion in a minimum length of time. This is a dangerous precedent to set and I am unable to subscribe to it. It is a long step toward reducing ". . . the Amendment to a nullity and [leaving] the people's homes secure only in the discretion of police officers." Johnson v. United States, supra, 333 U.S. at 14, 68 S.Ct. at 369.

MORGAN, Judge (concurring).

In his Dissenting Opinion, Judge Seiler states that : "The United States Supreme Court has ruled invalid a search and seizure which closely resembles the facts here, but which is not discussed by the principal opinion. * * * The factual similarity between Vale [Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970)] and the case at bar leaves little room for doubt that it is controlling here."

It is respectfully suggested that such statements are ill-founded in view of the following excerpt from the Vale case (1. c. 35, 90 S.Ct. 1972) : "There is no suggestion that anyone consented to the search. *Cf.* Zap v. United States, 328 U.S. 624, 628, 66 S.Ct. 1277, 1279, 90 L.Ed. 1477. The officers were not responding to an emergency. United States v. Jeffers, *supra,* 342 U.S. at 52, 72 S.Ct. at 95; McDonald v. United States, *supra,* 335 U.S. at 454, 69 S.Ct. at 192. They were not in hot pursuit of a fleeing felon. Warden v. Hayden, 387 U.S. 294, 298–299, 87 S.Ct. 1642, 1645–1646, 18 L.Ed.2d 782; Chapman v. United States, 365 U.S. 610, 615, 81 S.Ct. 776, 779, 5 L.Ed.2d 828; Johnson v. United States, 333 U.S. 10, 15, 68 S.Ct. 367, 369, 92 L.Ed.

436. The goods ultimately seized were not in the process of destruction. Schmerber v. California, 384 U.S. 757, 770–771, 86 S.Ct. 1826, 1835–1836, 16 L.Ed.2d 908; United States v. Jeffers, *supra;* McDonald v. United States, *supra,* 335 U.S. at 455, 69 S.Ct. at 193. Nor were they about to be removed from the jurisdiction. Chapman v. United States, *supra;* Johnson v. United States, *supra.*"

Two factors of interest here were not present in the Vale case: (1) "The officers were not responding to an emergency."; and, (2) "Nor were they [the drugs] about to be removed from the jurisdiction." Both factors are present in the instant case, which should make it readily distinguishable from the Vale case.

I concur in the principal opinion.