**STATE of Missouri, Plaintiff–Respondent**

v.

**Ronnie BUCKMASTER, Defendant–Appellant**

No. 22960.

Missouri Court of Appeals, Southern District, Division One.

April 25, 2000.

Nancy A. McKerrow, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Gregory L. Barnes, Asst. Atty. Gen., Jefferson City, for Respondent.

JOHN E. PARRISH, Judge.

Ronnie Buckmaster (defendant)[1] was convicted, following a jury trial, of attempt to manufacture a controlled substance. See §§ 564.011 and 195.211, RSMo 1994. Defendant's only claim of error is that the trial court erred in denying his motion to suppress statements made to law enforcement officers and in admitting those statements in evidence. This court affirms.

Springfield, Missouri, police officers Grant Dorrell and Ben King went to the intersection of Brown and Calhoun Streets in Springfield after another police officer reported an odor of ether at that location. The officers suspected the source of the odor was an attempt to produce methamphetamine. When the officers arrived, they smelled a strong odor of ether. Officer Dorrell testified, "As we started walking south towards 1233 North Brown, the odor became very intense and much stronger." They determined the odor was coming from a residence at that location.

The officers approached the east side of the residence where there was a screened-in porch and side door. There was a chain link fence around the premises. They observed a man who resided there, James Gardner, and defendant. The officers also saw Cheri Waters[2] and her two children just south of the residence on its east side. There was evidence that Ms. Waters also resided at the premises.

Mr. Gardner was asked to step outside the fence. Officer Dorrell told him they

1. Defendant's name appears in the record on appeal as "Ronnie Buckmaster" and "Ronney Buckmaster." The spelling "Ronnie Buckmaster" is used on the information and the judgment and sentence. That spelling is used in this opinion.

2. Ms. Waters' given name is spelled "Cheri" in the transcript of the suppression hearing. It is spelled "Sherry" in the trial transcript. This opinion uses the first spelling.

were investigating the odor of ether; that he believed it could be coming from methamphetamine production. Defendant was on the porch of the residence when Officer Dorrell began talking to Gardner. While the officer was talking to Mr. Gardner, defendant went into the house.

Officer Dorrell asked Mr. Gardner's permission to search the house. Gardner consented. Officer Dorrell told the trial court this occurred "three or four minutes after the defendant had went [sic] inside the house."

Officer King testified about what he observed at the Gardner residence. He was asked the following questions and gave the following answers:

Q. Prior to Mr. Gardner coming out to meet with you and Corporal Dorrell, where was the defendant?

A. He was standing just to the south of the door that went into the porch area of the house.

Q. And as Corporal Dorrell and you began to speak with Mr. Gardner, what did the defendant do?

A. I looked back towards the house and that's when I saw [defendant] go into the porch area and into the house itself.

. . .

Q. What happened next?

A. Corporal Dorrell had received consent from Mr. Gardner for us to search his residence for a lab or any illegal drugs that might be inside, so we proceeded over to the east door that [defendant] had gone into.

Q. When you got to that door, what did you find?

A. I tried the door and the door had been locked from the inside.

Q. What did you do then?

A. Began knocking on the door and yelling for [defendant] to open the door.

Q. Did he come immediately?

A. No, ma'am.

Q. How long was it?

A. Three to four minutes.

Q. Eventually, though, he did come to the door?

A. Yes ma'am.

After defendant opened the door, he came out to the porch. He was searched for weapons and drugs. None were found.

Officer King entered the residence. He told the trial court that he found numerous items he believed were involved in the manufacture of methamphetamine. He found an empty bottle of denatured alcohol, numerous mason jars soaking in the bathtub, and numerous syringes that had been thrown in a fireplace in the living room.

There was a utility area at the back of the house. A back door opened into another covered porch. As Officer King opened the back door, the odor of ether was very strong. He found an "active acid generator" in a Surge bottle on the corner of the porch. He explained that an active acid generator was "the combination of rock salt and liquid Drano." Officer King explained that an acid generator was necessary in the production of methamphetamine; that "[i]t's used right before the ammonia anhydrous, so it would be the third step from the final product."

Officer King found a can of liquid Drano and coffee filters on a shelf above the generator. He explained the significance of the liquid Drano. "The liquid Drano was what was in the Surge bottle along with rock salt, and then the coffee filters are usually used both in the very first process and the final process to separate pills from the liquids."

Officer King found other equipment in the back yard and garage he believed to be acid generators. He found four 24–count packets of pseudoephedrine pills in a bedroom in the house. He described the pseudoephedrine pills as "[t]he main ingredient for the starting process of manufacturing."

Officer Dorrell remained outside with James Gardner, defendant, Cheri Waters and her two children while Officer King searched the residence. The three adults were handcuffed. Officer Dorrell estimated Officer King was in the residence five to ten minutes.

When Officer King came back outside, he told Officer Dorrell he found evidence of a drug lab and described what he had seen. Officer Dorrell read the three adults their rights then interviewed them separately. He interviewed Gardner first, then defendant. Officer Dorrell testified that he advised defendant of his Miranda rights; that defendant acknowledged he understood those rights. Defendant did not request an attorney. Officer Dorrell told the trial court:

> He told me that James Gardner had been cooking meth. When Corporal McCullouch [sic] had driven by, and I guess Corporal McCullouch [sic] had said hi to him out the window, and as Corporal McCullouch [sic] drove by he told me that James Gardner went inside, dumped some liquid ephedrine down the sink.[3] And he also told me that there was another adult male out trying to steal some anhydrous ammonia so that Gardner could finish off the controlled substance.

Defendant, Gardner and Waters were arrested and taken to the city jail. After they arrived they were interviewed separately by Officer Daron Wilkins. Officer King was present at defendant's interview. Officer Wilkins read the Miranda rights to defendant. He signed a written waiver of those rights.

At trial Officer King was asked what he heard defendant tell Officer Wilkins. Officer King stated that defendant said he and Gardner had been "attempting to finish off what they called old base." Officer King understood that to mean that Gardner and defendant "had some methamphetamine in

the process and that they were just finishing off what they had left." Officer King said defendant told them that another man had left Gardner's residence earlier "to possibly steal some ammonia anhydrous."

Defendant told the officers that he was addicted to methamphetamine. Officer King testified, "He also showed us some sores on his back. He advised us from his extensive use that the sores were caused from the use of methamphetamine. I remember he advised us that it was the lithium that was coming out of his skin."

Officer Wilkins also testified. He said defendant told him, "We were trying to finish off some base for our own personal use." Officer Wilkins was asked, based on his training and experience, what the reference to "base" indicated to him. He answered, "When they refer to base it's the final process in manufacturing meth. The only thing that has to be done is extracting the meth from the liquid chemical that's there." He told the court and jury that during his interview of defendant, defendant was the first person to use the term "base."

Defendant filed a pretrial motion to suppress statements made to police officers. The motion was denied. At trial defendant objected to testimony about statements he made to Officers King and Wilkins.

Defendant's single point on appeal asserts the trial court erred in denying his motion to suppress statements and in admitting in evidence alleged statements to Officers Wilkins and King over objection. Defendant claims the statements were the product of an illegal arrest; that "at the time [defendant] was detained and arrested, all the arresting officer knew was that he was present at a house from which the smell of ether emanated and in which there was evidence that methamphetamine production may have occurred." Defen-

---

3. There was testimony that Corporal McCulloch had gone by the property en route to a call to another location; that he had smelled ether. Officers Dorrell and King came to the location to investigate.

dant argues that there was no evidence connecting him to the house or to what was inside; that there was no probable cause for his arrest.

This court's review of a ruling on a motion to suppress evidence is based on the evidence that was before the trial court. The question for resolve is whether that evidence was sufficient to sustain the trial court's finding. *State v. Villa–Perez*, [835 S.W.2d 897 (Mo.banc 1992)] at 902. In reviewing a motion to suppress evidence, an appellate court must consider all circumstances of the case. *State v. Milliorn*, 794 S.W.2d 181, 183 (Mo.banc 1990). The trial court's ruling will be upheld if it is plausible on the basis of the record in its entirety. *Id.* at 184. It will be reversed only if it is clearly erroneous. *Id.*

*State v. Bigsby*, 891 S.W.2d 160, 163 (Mo. App.1995).

Defendant was present when Officers Dorrell and King arrived to investigate the odor of ether that they suspected was coming from a methamphetamine lab. After consent to search the Gardner residence was obtained, Officer Dorrell detained defendant outside the residence for five to ten minutes while Officer King searched the residence. Following the search defendant was arrested.

The Fourth Amendment of the United States Constitution preserves the right of the people to be secure against unreasonable searches and seizures. Missouri's constitutional "search and seizure" guarantee, article I, section 15, is co-extensive with the Fourth Amendment. *State v. Rushing*, 935 S.W.2d 30, 34 (Mo.banc 1996). A warrant based upon probable cause is generally required to justify a search or seizure. However, the Fourth Amendment does not prohibit a so-called *"Terry"* stop ... that is based on reasonable suspicion supported by articulable facts that the person stopped is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)....

"Reasonable suspicion," which is a less demanding standard than "probable cause," *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), is to be determined by reference to the "totality of the circumstances." *Id.* (citing *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

*State v. Deck*, 994 S.W.2d 527, 534 (Mo. banc), *cert. denied,* — U.S. —, 120 S.Ct. 508, 145 L.Ed.2d 393 (1999).

In *State v. Childress*, 828 S.W.2d 935 (Mo.App.1992), this court acknowledged differing requirements for investigative detentions (or "Terry" stops) and arrests:

Although an investigative detention is a seizure for Fourth Amendment purposes, it need not be supported by probable cause. An investigative detention is justified where specific and articulable facts and rational inferences from those facts give rise to reasonable suspicion that a person has committed or is committing a crime.... [A]n arrest[ ] is a seizure characterized by highly intrusive or lengthy search or detention and is justified only where there is probable cause to believe that a person is committing or has committed a crime.

"Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *U.S. v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). "[I]n determining whether defendant's detention was reasonable, we examine the totality of all the circumstances." [*U.S. v.*] *Espinosa*, [782 F.2d 888 (10th Cir.1986)] at 891.

*Id.* at 945. This court finds no abuse of discretion by the trial court in its denial of defendant's motion to suppress evidence and the admission of the statements defendant made to Officers Wilkins and King in evidence.

 Officer Dorrell explained that there were three adult suspects present; that during the time Officer King searched the Gardner residence, Officer Dorrell was alone with them. There was a strong odor of ether at the premises, an indication that methamphetamine was being produced. Defendant had access to the residence. He had entered the residence alone prior to the search. The door to the residence was locked from the inside while defendant was in the residence. Defendant was in the residence and the door remained locked when Officer King attempted to enter the residence to conduct the search. In order to enter the residence, Officer King had to knock on the locked door and shout to gain defendant's attention. Officer King entered the premises only after defendant appeared at the door and opened it.

Under the circumstances, the law enforcement officers at the Gardner residence had a reasonable basis to suspect that methamphetamine was being produced at the Gardner residence. They had a reasonable basis to suspect that defendant was engaged in that activity. It was reasonable and appropriate to detain defendant, including placing him in handcuffs, while Officer King searched the premises. This permitted one police officer to monitor the three adult suspects while the other conducted the search. Before his arrest defendant was detained no more than five to ten minutes. The detention and the manner in which it occurred were not excessively intrusive. The investigative detention of defendant was reasonable. *See Childress,* 828 S.W.2d at 945.

4. "Probable cause for an arrest without a warrant exists where the facts and circumstances within the arresting officers' knowledge and of which they have reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in a belief that an offense has been or is being committed, *State v. Wiley,* 522 S.W.2d 281 (Mo. banc 1975); and that the person arrested is guilty of that offense, *State v. Robinson,* 484 S.W.2d 186 (Mo.1972)."

Following Officer King's search of the Gardner residence, there was strong evidence that methamphetamine was being produced at the Gardner residence. That information, together with those factors that made defendant a suspect for purposes of the investigative detention, provided probable cause for his arrest.[4] Considering all circumstances of the case, there was sufficient evidence for the trial court to deny defendant's motion to suppress statements he made to Officers Wilkins and King and for those statements to be admitted in evidence.[5] The judgment of conviction is affirmed.

CROW, P.J., and SHRUM, J., concur.

*State v. Olds,* 603 S.W.2d 501, 505 (Mo. banc 1980).

5. Defendant does not complain on appeal about the admission in evidence of the statement he made to Officer Dorrell while Officer Dorrell detained him at the Gardner residence, and a review of the record on appeal reveals that no objection was made to Officer Dorrell's trial testimony about the statement.