STATE of Missouri, Respondent,

v.

Johnny Ray ARD, Appellant.

No. 22682.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 12, 2000.

Motion for Rehearing and Transfer to Supreme Court Denied Feb. 3, 2000.

Application for Transfer Denied March 21, 2000.

Kent E. Denzel, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Andrea L. Mazza, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

Appellant, a prior offender, § 558.016.2,[1] was found guilty by a jury of statutory

---

1. References to statutes are to RSMo 1994.

rape in the first degree, § 566.032,[2] and sentenced by the trial court to fifty years' imprisonment.

Appellant brings this appeal from that judgment, maintaining the trial court erred in (1) denying Appellant's motion to suppress an incriminatory statement he made to investigators and receiving the statement in evidence at trial, and (2) failing to declare a mistrial, *sua sponte,* when the prosecutor made an allegedly improper remark during closing argument.

The crime occurred November 14, 1995. The victim was V___ G___ [3] (born July 9, 1982), henceforth referred to as "V___." On the date of the offense, V___ was residing with her father, H___ G___, and mother, D___ G___. They are henceforth referred to, respectively, as "Mr. G___" and "Mrs. G___."

Appellant's first point:

"The court erred in overruling Johnny's motion to suppress his statement and in admitting that statement into evidence, in violation of his right to due process of law, to remain silent, and to a fair trial before a fair and impartial jury. *See,* U.S. Const., 5th, 6th, and 14th Amends., and Mo. Const., Art. I, §§ 10 and 18(a). The police did not have probable cause to arrest Johnny because [V___'s] allegations were not shown to be reliable and were not corroborated by any other evidence. Johnny was arrested on the unsupported word of a thirteen year old of unknown credibility with no physical evidence or other witnesses to corroborate her claims. Johnny's statements after thirty two hours detention without being charged were the product of this illegal arrest and should have been suppressed as fruit of the poisonous tree."

**2.** Section 566.032.1 reads:
"A person commits the crime of statutory rape in the first degree if he has sexual intercourse with another person who is less than fourteen years old."

Because Appellant's theory of error is that the arresting officer had no probable cause for the arrest, this opinion shall set forth the information the officer had at the time he arrested Appellant. In recounting it, this court is mindful that appellate review of a trial court's ruling on a motion to suppress is limited to determining whether the evidence is sufficient to support the ruling. *State v. Carter,* 955 S.W.2d 548, 560[32] (Mo. banc 1997), *cert. denied,* 523 U.S. 1052, 118 S.Ct. 1374, 140 L.Ed.2d 522 (1998). In making that determination, an appellate court views the facts and any reasonable inferences arising therefrom in a light most favorable to the trial court's ruling. *Id.,* 955 S.W.2d at 560[33].

The arresting officer was David L. Cook, a Summersville police officer. The record contains testimony by Cook on two occasions: (1) a hearing on the motion to suppress, and (2) trial. The account of Cook's testimony set forth in the next twelve paragraphs is compiled from those sources.

1. About 10:45 p.m., November 14, 1995, Cook was exiting his squad car on the square in Summersville. Mr. G___ approached Cook and reported his 13-year-old daughter, V___, had left home with a man whose name Mr. G___ did not know. Mr. G___ said V___ "had been gone for about two and a half, three hours." Mr. G___ described the truck the man was driving.

2. After further conversation with Mr. G___, Cook, who had known Appellant several years, deduced the man referred to by Mr. G___ was Appellant.

3. Cook notified the Texas County sheriff's office about the incident and received permission to go "out into the county" in search of Appellant and V___.

**3.** Because of the nature of the crime and the victim's age, her name and the names of her parents are not revealed in this opinion.

4. Cook drove to the home of Appellant's sister and learned from her that Appellant and V___ had been there. Cook then "drove a few of the county roads" but found neither Appellant nor V___.

5. Cook returned to Summersville and drove to the G___ residence. There, he saw a truck "sitting in front of the house." The truck matched the description Cook had received from Mr. G___. Cook suspected the truck was Appellant's.

6. Cook saw Appellant walk out the front door of the G___ residence. Cook, clad in uniform, told Appellant he (Cook) wanted to talk to him. Cook asked Appellant to sit in Cook's squad car. Appellant complied.

7. Mr. G___ came out of the house and motioned to Cook. Cook walked over to Mr. G___. Mr. G___ told Cook that V___ said Appellant had "forced himself on her."

8. Cook walked back to his car and asked Appellant to get out. Appellant complied. Cook told Appellant he (Cook) was going to place him under arrest and put him in handcuffs for his safety and Cook's safety until Cook "could figure out what was going on." Cook handcuffed Appellant.

9. Cook then entered the house, taking Appellant with him. V___ was sitting on the floor in a corner. Her hands were "clasped around her knees" and she was "rocking back and forth . . . kind of crying, kind of sobbing."

10. Cook asked V___ what happened. V___ told Cook that Appellant had "forced her to have sex."

11. Cook took Appellant outside and told him he was "going to [Texas] [C]ounty for investigation of rape." Cook then placed Appellant in Cook's car and read Appellant his "constitutional rights."[4]

12. Cook drove Appellant to the Summersville Police Department—a two-minute journey—and from there to the Texas County sheriff's office at Houston—a twenty-minute journey.

Cook never questioned Appellant because, explained Cook, the crime occurred outside Summersville, hence it was not going to be his case.[5] Cook expected the "sheriff's department" to question Appellant after Cook "got him over there."

After arriving at the sheriff's office, an incident occurred that cast further suspicion on Appellant.

Cook took Appellant to the "booking room" where arrest reports are prepared and arrestees change from civilian clothing into a "jail uniform." The room was equipped with a toilet.

Cook obtained a uniform for Appellant and told him to remove his clothing and put on the uniform. As Appellant was removing his clothing, Cook noticed Appellant was wearing red "Jockey shorts."

The sheriff's dispatcher brought in a bag and told Cook to put Appellant's clothing, including his underwear, into the bag "for evidence." According to Cook, Appellant said "there was no way in hell that he was going to give his underwear for anything, and nobody was going to take them [sic] away from him."

Cook and the dispatcher left the room to obtain assistance from Sergeant Rocky Seiner of the Missouri State Highway Patrol who happened to be at the sheriff's office. About that time, Cook, the dispatcher and Seiner heard the toilet flush.

The trio returned to the booking room, where they searched Appellant and the room but never found the underwear.

Meanwhile, V___ had been taken to a hospital where medical personnel "did a rape kit."

---

**4.** The rights enumerated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**5.** Cook told the jurors his authority as a police officer was limited to the city of Summersville.

William E. Nichols, employed by the Division of Family Services, investigates child abuse and neglect in Judicial Circuit 25.[6] Nichols interviewed V___ around 1:00 p.m., November 15, 1995. He noticed "some scratches, and some slight, light bruising in her shoulder and neck area."

After interviewing V___, Nichols concluded Appellant's truck should be impounded and searched.

A judge issued a search warrant that evening.

The next morning—November 16, 1995—Nichols and Deputy Sheriff Carl Davis of Texas County searched Appellant's truck pursuant to the warrant. They found "long head hairs" and pubic hairs in the passenger compartment. Nichols's testimony:

"Q. Was there anything significant about those hairs themselves that you ... thought they were important, just by looking at them?

A. Red in color.

Q. And, of course, [V___'s] hair is red.

A. Yes."

Nichols and Davis seized the hairs as evidence.

Immediately after the search, Nichols and Davis had Appellant brought from his cell to the "deputies room." There, at 9:50 a.m., Davis read Appellant his Miranda rights.[7]

Appellant initially stated he "had not done anything" to V___. The interview continued, as related by Nichols:

"Q. And what happened after that?

A. We discussed some of the evidence that we had obtained, namely, trace evidence, and a rape kit that had been done at the hospital. I advised Mr. Ard that we were there to give him a chance to tell his side of the story, and—and

that's what we would like for him to do.

Q. And how did Mr. Ard respond to that?

A. He became quiet, somewhat withdrawn, lowered his head, and finally looked up and said, 'I didn't force her.'

Q. Mr. Nichols, from the time that Mr. Ard sat down in the deputies room, and signed that waiver of rights at 9:50, until the time that he said, 'I didn't force her,' how much time expired?

A. At that time, probably 20 minutes, 25 at the most.

. . . .

Q. What happened after that?

A. Mr. Ard then related that—he stated that he hadn't forced her. And that they had crossed a body of water. He got back to lock out the hubs on the four-wheel-drive vehicle, he got back in the truck. She came on to him. He had been drinking beer. Said first one thing led to the other, and the next thing he knew he was having sex with her.

Q. And what did he say then?

A. And he said he got to feeling bad about it, because he knew it wasn't right, and he stopped short of ejaculation."

Prior to trial, Appellant filed a motion to suppress "any and all statements" made by him. The "grounds" therefor were:

"1. The arresting officer failed to advise the defendant of his constitutional rights as established in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. The statements made by the defendant were coerced by the police and thus, the defendant's Fifth Amendment rights were violated. The defendant

---

**6.** Judicial Circuit 25 comprises Texas, Phelps, Pulaski and Maries Counties. § 478.137.

**7.** Footnote 4, *supra*.

had requested an attorney before any further questioning and thus any statement given by the defendant to any law enforcement officer or state investigator is inadmissable [sic] under the 4th, 5th, and 14th Amendments to the U.S. Constitution.

3. The statements of the defendant were obtained in violation of the Missouri constitution."

The trial court conducted an evidentiary hearing on the above motion and others filed by Appellant.[8] The prosecutor presented evidence regarding Appellant's arrest, the issuance of the search warrant, and Appellant's interview by Nichols and Davis.

Appellant testified in support of the motion to suppress. He avowed that immediately after the arresting officer—Cook—advised him of his rights, he (Appellant) said he wanted to speak to a lawyer before answering any questions. Appellant recounted he was never given an opportunity to speak to a lawyer or make a phone call after arriving at the Texas County jail. According to Appellant, when Nichols and Davis interviewed him November 16, 1995, he told them he wanted to speak to a lawyer but was never given that opportunity.

At the conclusion of the evidence, Appellant's lawyer[9] argued that because Appellant asked to speak to a lawyer immediately after Cook advised him of his rights, no further interrogation should have occurred. Consequently, insisted Appellant's lawyer, the interrogation by Nichols and Davis (some thirty-two hours later) was improper, and Appellant's incriminatory statements to them should be suppressed. Appellant's lawyer also asserted:

"Under Supreme Court Rule 22.06, the officer is clearly authorized to seize somebody upon probable cause. But they're only allowed to hold that person, detain that person, for a period of 20 hours. The court file reflects that a warrant was not obtained until November 16th sometime. And that's—that's a long ways from 20 hours. I think it's clear that he was continually incarcerated between midnight on the 14th to the morning of the 16th, when the interrogation took place.

We believe that based upon the illegal nature of that detention, that the statement given to the officer at that time should be suppressed."

This court finds nothing in Appellant's motion to suppress (quoted earlier) or in his lawyer's argument (quoted above) presenting the theory that Cook had no probable cause to arrest Appellant—the theory on which Appellant's first point (quoted earlier) hinges. The significance of that is discussed *infra*.

After the suppression hearing, but prior to trial, the trial court denied the motion to suppress.[10]

At trial, Mr. G___ testified Appellant drove to the G___ residence about 3:30 p.m., November 14, 1995, and "struck up a conversation" about his (Mr. G___'s) eldest son. V___ was present during the conversation.

Appellant invited V___ to go deer hunting. Mr. G___ denied permission because Appellant was alone and Mr. G___ "didn't know the man."

Appellant thereupon departed, but reappeared at the G___ residence about 5:00, accompanied by a man and a woman. Ap-

---

8. The judge who conducted the hearing is not the judge who presided at Appellant's trial.

9. The lawyer who represented Appellant at the suppression hearing is not the lawyer who represented Appellant at trial.

10. Cook testified unequivocally that Appellant never asked to speak to a lawyer. Davis testified that after he advised Appellant of his rights at the outset of the interview November 16, 1995, Appellant waived his right to counsel. Nichols testified Appellant never asked to see a lawyer until Nichols and Davis requested Appellant to put his incriminatory oral statements in writing.

pellant told Mr. G⎯ the woman was his sister.

*Appellant renewed his request that V⎯ "go look for a deer."* Because Appellant had the other couple with him, Mr. G⎯ assumed "everything would be all right." He gave V⎯ permission to go, but said *she should return by 9:30.*

Mr. G⎯ then took a nap. When he awoke, he asked Mrs. G⎯ whether V⎯ had returned. Mrs. G⎯ said they had returned about 8:30 and requested permission "to go out a little bit longer."

When V⎯ failed to return at the appointed time, Mr. G⎯ drove to the Summersville square and informed Cook. That incident is recounted in paragraph numbered 1 earlier in this opinion.

Mr. G⎯ then returned home. About 11:30 p.m., Appellant "drove up with [V⎯]." The other couple was not in Appellant's truck.

Appellant and V⎯ entered the house. Mr. G⎯ told Appellant he (Mr. G⎯) had "contacted the law."

Mr. G⎯ watched as V⎯ sat down by the "wood stove." Mr. G⎯ described V⎯'s demeanor: "[S]he had an expression of fright on her face ... I could tell that it wasn't just her normal look."

This court gathers from Mr. G⎯'s testimony that Appellant remained in the house only briefly, then went out.

Mr. G⎯ asked V⎯ whether "that man" did something to her. According to Mr. G⎯, V⎯ replied, "Yes, he raped me."

By that time, Cook had arrived. Mr. G⎯ went out and told Cook, "Why don't you just go ahead arrest that man, because she informed me that he had raped me [sic]."

Cook's action in response to that utterance is set forth in paragraphs numbered 8 through 12 earlier in this opinion.

V⎯, testifying at trial, said the couple in Appellant's truck was "Billy and Heidi."

Upon leaving the G⎯ residence, the quartet went driving "on the back roads," but saw no deer. Appellant allowed V⎯ to drive even though she had no license. He offered her beer, which she refused. During the excursion, Appellant tried to put his hand in V⎯'s shirt.

The quartet returned to the G⎯ residence. V⎯ and Heidi entered. While Heidi was in the bathroom, V⎯ asked Mrs. G⎯ whether she could stay out a little longer. Mrs. G⎯ said V⎯ could remain out one more hour. V⎯ did not tell Mrs. G⎯ that Appellant tried to put his hand in V⎯'s shirt.

After leaving the G⎯ residence, the quartet eventually went to "Billy and Heidi's house," as Heidi "needed to take her medicine." After watching "music videos," Appellant said V⎯ should return home "because it was getting late."

Appellant and V⎯ left, unaccompanied by Heidi and Billy. Appellant drove on an isolated "dirt road" that led to a river. Appellant stopped and got out to "lock the four-wheel drive in." After crossing the river, Appellant exited again to unlock four-wheel drive.

Upon reentering the truck, Appellant asked V⎯ if she "wanted to have sex." She replied, "No."

Undeterred, Appellant began "undoing" V⎯'s "bluejean pants." She tried to push him away, but he held her down by her "upper chest" and around her neck. He then pulled down her underwear and forced his penis into her vagina.

After copulation, Appellant told V⎯ "not to tell ... anybody about this." He then drove her home. During the journey, she was as close to the passenger door as she could get.

V⎯'s account of what occurred when she got home was essentially the same as Mr. G⎯'s account, set forth earlier.

Mrs. G⎯, called as a witness by Appellant at trial, testified V⎯ played "Nintendo" after returning home.

V___ denied playing Nintendo.

Cook's encounter with V___ is described in paragraphs numbered 9 and 10 earlier in this opinion. Cook mentioned nothing about V___ playing Nintendo.

Mr. G___'s testimony contains no mention of Nintendo.

When Nichols was asked at trial about Appellant's incriminatory statements, Appellant's lawyer [11] objected, renewing the "arguments" in the motion to suppress (and presumably the oral argument at the suppression hearing). Appellant's lawyer registered no objection that Cook lacked probable cause to arrest Appellant or that Appellant's statements were the fruit of an unlawful arrest.

The trial court overruled the objection and received the statements in evidence.

Appellant's motion for new trial assigned error in the receipt of his incriminatory statements in evidence, averring the statements "were the product of an unlawful detention." When Appellant's lawyer argued the new trial motion to the trial court, he explained the unlawful detention "was due to the fact that Mr. Ard was detained for longer than 20 hours without an arrest warrant coming down." Appellant's lawyer said nothing indicating Cook lacked probable cause to arrest Appellant.

It thus appears to this court that Appellant waited until this appeal to raise the theory that Cook lacked probable cause to arrest him. The absence of probable cause is the cornerstone of Appellant's first point, as illustrated by the argument following it. The argument reads, *inter alia:*

> "All Cook had to go on was, at best, [V___'s] word of what happened. He had no physical or medical evidence. He had no eyewitness statements. He did not even have any knowledge of [V___'s] reliability. . . .

[T]here was no way Cook could judge [V___'s] reliability, nor was there any corroboration of her tale. . . . Arresting Johnny was therefore unjustified and illegal. The statements he made, that he had sex with [V___] but did not force her, and where this allegedly took place, were obtained only because of that illegal arrest and detention. The fruit of the poisonous tree doctrine holds that evidence obtained as a direct result of an illegal seizure should be suppressed. Johnny was illegally seized without probable cause, and the fruit of that illegal seizure was his statements." (Citations omitted.)

Appellant's brief refers to § 544.170, which provides that all persons arrested without warrant shall be discharged within twenty hours unless formally charged with a criminal offense and held by warrant. As we have seen, Appellant's lawyer told the trial court at the suppression hearing that Appellant's detention became illegal upon extending beyond twenty hours.

However, Appellant concedes in this court that a violation of § 544.170 does not automatically make a statement involuntary. *See: State v. Smith,* 747 S.W.2d 678, 682[8] (Mo.App. S.D.1988), where this court, citing *Roberts v. State,* 476 S.W.2d 490, 494 (Mo.1972), held detention beyond the twenty-hour limit, standing alone, is insufficient to make an otherwise voluntary statement involuntary.

Furthermore, § 544.170 addresses only the length of time an arrestee can be held without being formally charged; it does not address probable cause for an arrest.

This court therefore concludes Appellant's theory that his incriminatory statements to Nichols and Davis were inadmissible because Cook lacked probable cause to arrest him was never presented to the trial court.

---

**11.** The lawyer who represented Appellant at trial is not the lawyer representing Appellant in this appeal.

To preserve an objection to evidence for review, the objection must be specific, and the point raised on appeal must be based upon the same theory. *State v. Morrow*, 968 S.W.2d 100, 106[3] (Mo. banc 1998), *cert. denied*, 525 U.S. 896, 119 S.Ct. 222, 142 L.Ed.2d 182 (1998). A trial court will not be convicted of error in admitting testimony for a reason not presented to it, hence reasons urged in a brief which were not advanced to the trial court are of no avail. *State v. Stevens*, 467 S.W.2d 10, 18[4] (Mo.1971), *cert. denied*, 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546 (1971).

Consistent with the authorities in the preceding paragraph, this court holds Appellant's theory that Cook lacked probable cause to arrest him is ineligible for review. Consequently, the only possible relief available to Appellant under his first point is the relief authorized by Rule 30.20.[12] It authorizes an appellate court, in its discretion, to consider plain errors affecting substantial rights when the court finds that manifest injustice or miscarriage of justice has resulted therefrom. Applying that standard, this court finds no basis for relief.

Probable cause to arrest exists when the facts and circumstances within the knowledge of the arresting officers, and of which they have reasonably trustworthy information, are sufficient to warrant a belief by a person of reasonable caution that the person to be arrested has committed the crime for which he is being arrested. *State v. Sidebottom*, 753 S.W.2d 915, 923[20] (Mo. banc 1988), *cert. denied*, 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988). While the quantum of information necessary to fashion probable cause means more than mere suspicion, its existence must be determined by practical considerations of everyday life on which reasonable persons act and not the hindsight of legal technicians. *State v. Heitman*, 589 S.W.2d 249, 253[5] (Mo. banc 1979), *cert. denied*, 446 U.S. 941, 100 S.Ct. 2164, 64 L.Ed.2d 795 (1980).

A citizen who purports to be the victim of, or to have witnessed, a crime is a reliable informant even though his or her reliability has not theretofore been proven or tested. *State v. Whorton*, 487 S.W.2d 865, 867[2] (Mo.1972).

In the instant case, V____'s statement to Cook that Appellant had "forced her to have sex"[13] meant she was both a victim and a witness to the crime of statutory rape in the first degree.[14]

Appellant cites *State v. Wiley*, 522 S.W.2d 281 (Mo. banc 1975), in support of his hypothesis that because V____'s accusation was not corroborated, Cook lacked probable cause to arrest him. Appellant misunderstands *Wiley*.

In *Wiley*, the accused's arrest was based on information from an anonymous informant transmitted by phone on a "tip" line. *Id.* at 284, 287. Upholding the arrest, the opinion said:

"The true inquiry therefore is whether the informant's present information is reliable. As long as the corroboration of the information through other sources, even though the matters are innocuous, reduces the chances of a 'reckless or prevaricating tale,' the information, even though hearsay, may form the basis of probable cause for an arrest."

*Id.* at 288[12].

The obvious difference between *Wiley* and the instant case is that the identity of

---

**12.** References to rules are to Missouri Rules of Criminal Procedure (1999).

**13.** As recounted in paragraph numbered 10 earlier in this opinion, Cook quoted V____ as saying Appellant "forced her to have sex." At trial, V____ testified she told Cook that Appellant "had raped me." Regardless of which version is accurate, the import of V____'s disclosure was that Appellant had engaged in sexual intercourse with her. Cook already knew from his earlier conversation with Mr. G____ that V____ was thirteen years old.

**14.** Footnote 2, *supra*.

the individual who supplied the information on which the arrest was based in *Wiley* was unknown, while in the instant case V___ provided the information in person to the arresting officer, Cook. As V___, by her account, was both a victim and a witness, the controlling case is *Whorton*, not *Wiley*.

Furthermore, contrary to Appellant's belief, V___'s accusation was—at least arguably—corroborated, as henceforth explained.

As recounted earlier in this opinion, Mr. G___ noticed "an expression of fright" on V___'s face when she returned home. When he asked her whether Appellant did something to her, she replied that Appellant raped her. Mr. G___ told Cook about V___'s disclosure before Cook entered the house and questioned V___.

In *State v. Hawkins*, 778 S.W.2d 780 (Mo.App. W.D.1989), the accused forcibly raped the victim. *Id.* at 781. The victim screamed. *Id.* Her screams were heard by her sister, "a house away." *Id.* When the sister arrived at the victim's house, the accused fled. *Id.*

At trial, the sister testified, over a hearsay objection, that when she entered the house and asked the victim what happened, the victim replied, "Lee [the accused] had raped her." *Id.* at 782. Rejecting the accused's claim that the victim's statement to her sister was inadmissible, the court explained:

"A spontaneous statement or excited utterance is an exception to the hearsay rule under the rationale that where the statement is made as a result of shock produced by the event, the utterance

may be taken as expressing the true belief of the speaker. *State v. Griffin*, 662 S.W.2d 854, 858 (Mo. banc 1983), *cert. denied*, 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 153 (1984). A victim's statement that she has been raped is admissible as an excited utterance. *State v. Wilson*, 719 S.W.2d 28, 33 (Mo.App. 1986).

The statement here was admissible under the above authority as an exception to the hearsay rule. The assault by [the accused] had only just been perpetrated and the shock of the event lends the necessary credibility to the statement."

*Hawkins*, 778 S.W.2d at 782[3].

Although the record in the instant case does not show how much time elapsed between the copulation and V___'s arrival home, it is inferable that the journey was relatively short.[15] V___, at the first opportunity, told Mr. G___ that Appellant raped her. According to Mr. G___, V___'s facial expression indicated fright. Cook, upon entering the house, observed V___ was "kind of crying, kind of sobbing."

Applying *Hawkins*, 778 S.W.2d at 782[3], to the facts in the preceding paragraph, this court holds V___'s statement to Mr. G___ that Appellant raped her was arguably substantive evidence. Mr. G___ told Cook about V___'s statement before Cook asked V___ what happened. Thus, when V___ told Cook that Appellant forced her to have sex, Cook had knowledge that V___'s accusation was—at least arguably—corroborated by her earlier statement to Mr. G___.[16]

---

**15.** During the November 16, 1995, interview, Nichols showed Appellant a Texas County map. Appellant pointed to the location where the copulation occurred. The map was received in evidence, but has not been filed in this court. Nonetheless, this court deduces from Nichols's testimony that the distance from the scene of the crime to the G___ residence was no more than ten miles.

**16.** Appellant maintains V___'s statement to Cook lacked credibility because: (1) according to Mrs. G___, V___ played Nintendo after returning home, and (2) V___, when asking Mrs. G___ for permission to go out again after the first excursion, did not reveal that Appellant tried to put his hand in her shirt. Mrs. G___'s testimony about V___ playing Nintendo was given at trial, August 4, 1998, almost thirty-three months after Cook arrested Appellant. Nothing in the record indicates Cook was aware of incident 1—if it indeed oc-

Furthermore, it is inferable that Appellant flushed his underwear down the toilet during the booking process at the Texas County sheriff's office. That incident, which occurred some thirty minutes or so after Appellant's arrest, buttressed Cook's probable cause to believe Appellant had intercourse with V___.

As this court fathoms the argument following Appellant's first point, he does not challenge the voluntariness of his statements to Nichols and Davis. Appellant candidly states:

> "This is not an issue of the voluntariness of Johnny's statements. He was given *Miranda* warnings and was not threatened or mistreated physically. But whether voluntary in that sense or not, the illegal character of the arrest tainted the interrogation that no amount of warnings could purge. The *Miranda* warning were [sic] not sufficient to remove the taint of this illegal arrest. As the fruit of the poisonous tree of this illegal arrest, Johnny's statement should have been suppressed." (Citations omitted.)

Emphasizing that this court is reviewing the above contention for only plain error, this court, for the reasons heretofore set forth, holds the receipt in evidence of Appellant's incriminatory statements was not a manifest injustice or miscarriage of justice. Accordingly, plain error relief is unwarranted. *State v. Hutchison*, 957 S.W.2d 757, 761[2] (Mo. banc 1997).

■■■ Appellant's second point avers the trial court plainly erred in failing to declare a mistrial *sua sponte* when, during closing argument, the prosecutor (according to Appellant) asked the jurors to convict Appellant to prevent future threats to the jurors' children and homes. The prosecutor's argument, says Appellant, led the jury to convict him for reasons wholly irrelevant to his guilt.

Appellant concedes, and the record confirms, that his lawyer registered no objection to the argument. Consequently, no claim of error regarding the argument is preserved for review. *State v. Porter*, 458 S.W.2d 256, 259[6] (Mo.1970). Accordingly, as with Appellant's first point, the only relief available to him is for plain error under Rule 30.20.

■■■ Relief should rarely be granted on assertions of plain error as to closing argument because, in the absence of objection and requests for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention. *State v. Silvey*, 894 S.W.2d 662, 670[4] (Mo. banc 1995). Accordingly, plain error relief is granted because of improper argument only if it is established that the argument had a decisive effect on the jury's determination. *State v. Parker*, 856 S.W.2d 331, 333[3] (Mo. banc 1993).[17]

After reviewing the segment of the prosecutor's argument about which Appellant's second point complains, this court con-

---

curred—or incident 2 when he arrested Appellant.

**17.** As observed in *State v. Derrick*, 965 S.W.2d 418, 419–20[2] n. 1 (Mo.App. S.D.1998), appellate courts are wary of claims that a trial court erred in failing to declare a mistrial *sua sponte* in a criminal case. That is because generally, the double jeopardy clause of the Fifth Amendment to the Constitution of the United States bars retrial if a judge declares a mistrial in a criminal case without the defendant's request or consent. *State v. Tolliver*, 839 S.W.2d 296, 299[9] (Mo. banc 1992). Consequently, a judge who declares a mistrial in a criminal case *sua sponte* may thereafter

be confronted by the defendant's contention that he cannot be retried. Reversing convictions because trial courts fail to declare mistrials *sua sponte* allows defendants to remain mute when incidents unfavorable to them occur during trial, gamble on the verdict, then obtain a new trial if the verdict is adverse. This puts trial courts in an untenable position and is contrary to the principle that an appellate court will not, on review, convict a trial court of error on an issue which was not put before it to decide. *Lincoln Credit Co. v. Peach*, 636 S.W.2d 31, 36[12] (Mo. banc 1982), *appeal dismissed*, 459 U.S. 1094, 103 S.Ct. 711, 74 L.Ed.2d 942 (1983).

cludes that even if the argument was improper—an issue this court need not decide—the argument was not inflammatory enough to have a decisive effect on the verdict. Appellant is therefore ineligible for plain error relief.

Judgment affirmed.

PARRISH and SHRUM, JJ., concur.