STATE of Missouri, Respondent,

v.

Bryan WURTZBERGER, Appellant.

No. ED 89960.

Missouri Court of Appeals,
Eastern District,
Division One.

Sept. 23, 2008.

Scott Rosenblum, Brocca Smith, St. Louis, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Roger W. Johnson, Assistant Attorney General, Jefferson City, MO, for respondent.

KURT S. ODENWALD, Presiding Judge.

### Introduction

Bryan Wurtzberger (Defendant) appeals from his conviction, following a jury trial, of one count of possession of a controlled substance, in violation of Section 195.202,[1] one count of attempt to manufacture a controlled substance, in violation of Section 195.211, and one count of possession of a controlled substance with intent to distribute, in violation of 195.211. The trial court sentenced Defendant to 15 years for pos-session of a controlled substance and 20 years on the remaining two counts, running concurrently for a total of 20 years of imprisonment. Following sentencing, the trial court entered a judgment of default on execution on Defendant's bond. We affirm Defendant's conviction and sentence, but remand the case to correct the clerical mistake in Defendant's sentence and judgment. Additionally, we reverse the trial court's judgment on default and execution on forfeiture of Defendant's bond and remand to the trial court for further proceedings.

### Background

Defendant was charged by the State of Missouri (State) with possession of a controlled substance, attempt to manufacture a controlled substance, and possession of a controlled substance with intent to distribute, in connection with his alleged actions on December 14, 2005. Defendant's trial by jury took place from January 18 to January 19, 2007. Defendant did not testify at trial, but his father, David Wurtzberger (Father) testified on Defendant's behalf.

During trial, the following evidence was presented:

On December 14, 2005, Lewis County C–1 school bus driver, Melanie Klingele (Klingele), testified that she was driving students home from school when she observed a maroon-colored car sitting in the middle of the road and blocking the bus. Finally the driver moved his car out of her path. Klingele did not think the driver could see out of his car because the car windows were fogged. When Klingele saw the car again on her return trip, she stopped the bus to ask the driver if he was having car trouble. The driver, Defendant, who Klingele identified as an ac-

---

1. All subsequent statutory citations are to RSMo 2000, unless otherwise indicated.

quaintance, opened the car door enough to stick his face out and decline her assistance. Klingele also observed a female in the front seat of the car with Defendant. Klingele and the children on the bus noticed an unusual smell coming from the car. The father of some of the children on the bus later contacted Klingele to discuss his children's same observations, which he had reported to the Sheriff's Department.

Chief Deputy of the Lewis County Sheriff's Department Rob Power (Deputy Power) testified regarding his involvement in the December 14, 2005 investigation. After receiving information from the school children's father that their neighbor, Defendant, may have been manufacturing methamphetamine, law enforcement officers went to Defendant's residence. Although a light was on inside the residence, no one answered the front or back doors. Deputy Power testified that as he left the residence he walked by a truck parked in front. Deputy Power saw some rubber tubing and a dish with black residue in it in the bed of the truck, and recognized these things as items used to manufacture methamphetamine. Deputy Power and Sheriff David Parrish (Sheriff Parrish) crossed the road where another truck was parked. In the truck bed of the second truck, Deputy Power and Sheriff Parrish found more items used to manufacture methamphetamine, including syringes and rubber tubing, a blue cooler containing a lithium battery strip, and a bottle of Liquid Fire drain cleaner with salt residue in the bottom of the bottle.

As Deputy Power and Sheriff Parrish left the residence to apply for a search warrant, they saw a maroon car, which Deputy Power knew to be owned by Defendant. Deputy Power and Sheriff Parrish followed the car back to Defendant's residence where they spoke with Defen-

dant and searched his vehicle. Defendant's car had a strong chemical odor consistent with the manufacturing of methamphetamine, but contained no contraband or items used to manufacture methamphetamine. Deputy Power arrested Defendant for possession of drug paraphernalia and took him to the Lewis County Sheriff's Department. Defendant's live-in girlfriend, Jamie Roberson (Roberson), who was with Defendant in the car, was also transported to the Lewis County Sheriff's Department for an interview.

At the sheriff's department, Defendant signed a waiver of his *Miranda* rights[2] and Deputy Power interviewed Defendant. Defendant told Deputy Power that he had not been involved in making methamphetamine, and that he did not have anything at his residence used to manufacture methamphetamine. Defendant admitted that he owned the truck parked across the street, but denied knowing anything about the items in the truck. When Deputy Power asked Defendant if he would consent to a search of the house, Defendant answered that "he knew he wasn't talking about misdemeanor stuff and that there was drug paraphernalia in the house." Deputy Power testified that Defendant "appeared to be, what we call, tweaking. He was nervous, agitated, fidgeting, a lot of eye movement, wasn't stringing a lot of things together. When he would talk, he couldn't stand still, very agitated."

Deputy Power and Sheriff Parrish obtained and executed a search warrant for Defendant's residence. The trailer residence and shed were secured and then entered. In a cabinet on the wall of the shed, Deputy Power located a can of acetone; two one-pound cans of salt—one with unused lithium batteries inside the

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

salt canister; two coffee grinders—one with white residue; and some rubbing alcohol. Each of those items may be used to manufacture methamphetamine. In the shed, Deputy Power discovered a red gas can with a hole drilled in its side. The cap was missing from the can, and in the base of the can was a salt mixture that was actually "gassing" when the officers moved it.

Sheriff Parrish also testified at trial about his conversation with Roberson before the officers searched the residence. Sheriff Parrish testified that Roberson admitted there would be some marijuana in the residence and that there would be a plate on the bar in the kitchen on which she and Defendant had smoked methamphetamine earlier in the day. Sheriff Parrish testified that during the search, he observed a plate with a straw on it, along with a bag of marijuana, but found it on a shelf in the kitchen instead of the bar. Sheriff Parrish also recalled that Roberson told him that one small bag of marijuana belonged to her. Other than the bag of marijuana, she was aware of nothing else besides the plate. When Roberson was asked about the manufacture of methamphetamine, she admitted that Defendant had manufactured methamphetamine in the past and that he asked her to purchase pills for him. However, Roberson denied ever purchasing pills, and said that she thought Defendant had quit manufacturing approximately a month prior to that time. Roberson told Sheriff Parrish that she did not believe any items used in manufacturing methamphetamine would be found in the search of the residence.

Three narcotics investigators with the Northeast Missouri Drug Task Force testified regarding their assistance in executing the search warrant at Defendant's residence. Detective Brad Robertson was responsible for logging the items found

and collected from the premises. Detective Joe Hayes testified regarding his assistance in photographing the items found. Additionally, Detective Mark Bouyea testified regarding his assistance with the search warrant, and particularly his job to seize the items located.

The three investigators testified as to the items they found during their search, including a blue and white dish with two clear baggies containing marijuana, one small green plastic bag with white powdery substance, one green and white snort tube, one US300 scale, one box of quart-size plastic baggies, and a plate containing one line of white powdery substance, which field tested positive for methamphetamine and was found on the kitchen shelf. Additional items recovered from the residence were two small green bags with white powdery residue found on the kitchen counter top, one red bottle of Liquid Fire, one Black and Decker coffee grinder with white powdery residue found under the kitchen sink, one package of green baggies found on the shelf by the door, and one dugout and one pipe loaded with marijuana found on the kitchen bar. On a grey tote in the living room, the investigators found one green pipe, one small baggy containing marijuana, and one orange pill bottle with pills and a cylindrical bong inside. Additionally, the detectives found an ashtray with three zig-zag packs, marijuana seeds, marijuana, one pipe loaded with marijuana found on lamp table, a Wal–Mart receipt containing Defendant's name and dated November 28, 2005, one small green baggy, and one plastic snort tube in the top right dresser drawer in the bedroom.

The detectives testified that they also found one Wal–Mart receipt dated November 23, 2005, in a cup on the desk, plastic tubing found in back of the green Ford Ranger in the driveway, a Toyota pickup containing lithium battery strips in a cool-

er, two syringes in a bucket in the truck bed, plastic tubing and one syringe in the back of the Toyota pickup, and an Aldi's bag with a red Liquid Fire bottle with no lid and residue found in the bed of the Toyota pickup.

The detectives found two cans of Coleman fuel, and one can of iodized salt near the work bench in the shed. They also found in a clear plastic container inside an old microwave in the shed: one plastic container of loose marijuana and seeds, one baggy with loose marijuana and seeds containing two separate bags of seeds and one plastic-wrapped bag of marijuana, a second baggy containing seeds and marijuana and also containing three separate bags of seeds, and a third baggy with four individually wrapped bags of marijuana. Finally, the detectives recovered two coffee grinders (one with residue), two cans of salt, one can of acetone, one bottle of mineral spirits, one red gas can used as a generator found along a wall on the floor in the shed, and one small green baggy found on the dresser in bedroom.

Sergeant Patty Talbert with the Northeast Missouri Narcotics Task Force also testified regarding her assistance with executing the search warrant. She explained that she discovered the two Wal–Mart receipts in the master bedroom—one in a dresser drawer and the other on a computer desk. One of the receipts, dated November 28, 2005, listed items such as eight-foot air tubing, three containers of iodized salt, more tubing, and acetone. She explained that the bottom of the receipt said, "Thank you for shopping with us Wurtzberger, Bryan E." The other receipt, dated November 23, 2005, listed two containers of camp fuel and three 8–pack packages of E2 lithium batteries.

Father, who lived next to Defendant's property, testified that Defendant lived at the residence that had been searched. He also testified that Defendant worked on vehicles and farmed for a living, and always had access to the shed located on the property.

On January 19, 2007, the jury found Defendant guilty of the charges of possession of a controlled substance (Count I), attempt to manufacture a controlled substance (Count II), and possession of more than five grams of marijuana with intent to distribute (Count III). On February 13, 2007, Defendant filed a Motion for Judgment of Acquittal or in the Alternative Motion for New Trial, which the trial court heard and denied. Defendant argued that the trial court erred when it submitted to the jury verdict directing instructions as to each of the three counts because the evidence at trial was legally insufficient. The case was continued to March 6, 2007, for sentencing, at which time the trial court ordered Defendant, a prior and persistent offender and a prior drug offender, to serve concurrent terms of 15 years in the Missouri Department of Corrections for Count I, 20 years for Count II, and 20 years for Count III, for a total of 20 years. At that time, the trial court heard the State's Motion to Revoke and Forfeit Defendant's Bond. As discussed in further detail in Point III, *infra,* the trial court found that "justice requires the forfeiture of defendant's bond" and entered a default judgment against Defendant.

This appeal follows.

### Points on Appeal

Defendant raises three points on appeal. In his first point, Defendant claims the trial court erred in denying his motion for judgment of acquittal at the close of the evidence because there was insufficient evidence to support the verdicts. Defendant alleges the State failed to show that Defendant had exclusive dominion and control over any of the controlled substances or

materials alleged to be intended to manufacture a controlled substance.

In his second point, Defendant claims the trial court erred in misclassifying Count II as a class A felony at sentencing because Defendant was charged as a prior and persistent offender. Defendant argues that the range of punishment is increased as a result of such a finding, but the class of the felony does not change.

In his third point, Defendant avers the trial court erred in issuing a judgment on default and execution on forfeiture of bond because there was no factual basis for the court to find that the money belonged to Defendant. Defendant claims that the parties agreed Father was a surety and the money belonged to him at the time of the hearing, and the judge heard no facts that would support his finding that Father was not a surety. Defendant further claims that if the money did not belong to Defendant, then justice could not require its forfeiture based on Defendant's criminal history.

We will review each of Defendant's three points separately.

### Point I—Judgment of Acquittal Properly Denied

In Defendant's first point, he argues that the trial court erred in denying his motion for judgment of acquittal at the close of the evidence because the State presented insufficient evidence to support the verdicts. Defendant explains that the State failed to show that Defendant had exclusive dominion and control over any of the controlled substances or materials alleged to be intended to manufacture controlled substances.

### Sufficiency of Evidence Standard of Review

This court's review of a challenge to the sufficiency of evidence supporting a criminal conviction is limited to a determination of whether sufficient evidence was presented at trial from which a reasonable juror might have found the defendant guilty of the essential elements of the crime beyond a reasonable doubt. *State v. Farris*, 125 S.W.3d 382, 387 (Mo.App. W.D.2004), *citing State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993). In applying this standard of review, the Court accepts as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence, and disregards all evidence and inference to the contrary. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). The court does not act as a "super juror" with veto powers over the conviction, but gives great deference to the trier of fact. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998).

### Discussion

 We must first look to the elements of each offense charged because when we consider the sufficiency of the evidence to support a conviction, there must be sufficient evidence of each element of the offense. *State v. Dixon*, 70 S.W.3d 540, 544 (Mo.App. W.D.2002). The elements of an offense are derived from the statute establishing the offense or, when relevant, common law definitions. *Id.* Defendant was convicted of possession of methamphetamine, the elements of which are found in Section 195.202.[3] Defendant was also convicted of possession of marijuana with intent to distribute and attempt to manufacture methamphet-

---

**3.** Section 195.202.1 states in part: "it is unlawful for any person to possess or have under his control a controlled substance."

amine, which are found in Section 195.211.[4] Lastly, because Defendant was charged with "attempt" to manufacture methamphetamine, we review the elements of attempt found in Section 564.011.1.

A person commits an "attempt" when, "with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense." A "substantial step" is "conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." Section 564.011.1. Thus, an attempt to commit a crime has two elements: (1) the defendant has the purpose to commit the underlying offense, and (2) the doing of an act which is a substantial step toward the commission of that offense. *State v. Farris*, 125 S.W.3d at 387. For attempt to manufacture a controlled substance, "[c]onduct constituting a substantial step includes possession of materials designed specifically for an unlawful purpose or that could not serve a lawful purpose under the circumstances." *Id.*

To prove that Defendant engaged in a substantial step to manufacture methamphetamine through the possession of materials used to manufacture methamphetamine, this Court applies "the same standard of actual or constructive possession in manufacturing cases as is used in possession cases." *Id. quoting State v. Rollett*, 80 S.W.3d 514, 521 (Mo.App.2002). To establish possession the State must prove two elements: (1) that Defendant had "conscious and intentional possession of the substance, either actual or constructive," and (2) that he was aware of "the presence and nature of the substance." *Id., quoting State v. Purlee*, 839 S.W.2d

584, 587 (Mo. banc 1992). These prongs may be proven by circumstantial evidence, and may not be entirely independent of each other. *Id.*

A person has actual possession of the items that are on his person or within easy reach and convenient control. Section 195.010.32. Constructive possession arises when a person, although not in actual possession of the item, has the power and the intention at a given time to exercise dominion and control over the substance either directly or through another person or persons. Section 195.010.32. *See also State v. Johnson*, 81 S.W.3d 212, 215 (Mo. App. S.D.2002). Possession may be sole or joint. Section 195.010.32.

The record before us does not support a conviction based upon Defendant's actual possession of the substances upon which his convictions were based. If actual possession is not present, as in this case, constructive possession of the drugs or the drug components and apparatus will satisfy this burden if other facts exist which buttress the inference of the defendant's requisite mental state. *State v. Withrow*, 8 S.W.3d 75, 80 (Mo. banc 1999).

To prove constructive possession, the State must, at a minimum, establish that the defendant had access to and control over the premises where the materials were found. *State v. Withrow*, 8 S.W.3d at 80. Where a person does not have exclusive control, but instead shares joint control of the premises, the State must have presented "some incriminating evidence" that raised the inference of such knowledge and control of the materials. *Id.* Various types of incriminating evidence that prior courts have held permit an in-

---

**4.** Section 195.211.1 makes it unlawful for any person "to distribute, deliver, manufacture, produce or attempt to distribute, deliver, manufacture or produce a controlled substance or to possess with intent to distribute, deliver, manufacture, or produce a controlled substance."

ference of the requisite knowledge and control in cases involving joint possession of premises include self-incriminating statements, *State v. Wiley*, 522 S.W.2d 281, 292–93 (Mo. banc 1975); consciousness of guilt, *State v. Dreiling*, 830 S.W.2d 521, 524–25 (Mo.App. W.D.1992); routine access to the place where the controlled substance is found, *State v. Buford*, 907 S.W.2d 316, 318 (Mo.App. E.D.1995); the commingling of the controlled substance with a defendant's personal belongings, *State v. Steward*, 844 S.W.2d 31, 33 (Mo. App. W.D.1992); the smell of chemicals used to manufacture the drug, *Farris*, 125 S.W.3d at 382; a great quantity of the illegal substance at the scene, *Steward*, 844 S.W.2d at 34; and the substance being in public view and accessible by the defendant, *State v. Kerfoot*, 675 S.W.2d 658, 661 (Mo.App. E.D.1984). The totality of the circumstances is considered in determining whether there are sufficient additional incriminating circumstances to prove possession. *Farris*, 125 S.W.3d at 388.

Defendant argues that he did not have exclusive use or possession of his residence, but instead shared control with Roberson, and therefore, no inference can be drawn that Defendant had knowledge of the presence and character of the substances or was intentionally and consciously in possession of the proscribed substances. Defendant argues that the State presented even less evidence of possession than was presented in *State v. Withrow*, 8 S.W.3d at 80. We disagree. *Withrow* is factually distinguishable from the case before us and provides no support for Defendant's claim.

In *Withrow*, the police found the defendant exiting a bedroom containing firearms, drug-making equipment, and a closet, probably locked, with pills undergoing the first stage of methamphetamine production and a strong odor of solvent emit-

ted from the room he exited. *Id.* at 80–81. No evidence demonstrated that the defendant lived in the house, and nothing beyond the defendant's presence in the room truly connected the defendant to the manufacturing apparatus or jar in the closet. *Id.* at 81. The Missouri Supreme Court found such evidence insufficient to support a conviction of attempt to manufacture methamphetamine based on the defendant's constructive possession of materials. *Id.* In its decision, the Court reasoned that the state must show possession of the materials being used to manufacture methamphetamine, but found that the evidence showed only that the defendant was present in the house in which there was an attempt by someone to manufacture methamphetamine in a locked closet. There was no evidence that the defendant lived in the house or had any connection to the contraband and materials found within the locked closet. *Id.*

Distinguished from *Withrow*, at Defendant's trial the State presented evidence that established a connection between Defendant and the materials found, which was far greater than Defendant's mere presence at a residence in which there was an ongoing attempt to manufacture methamphetamine. Here, evidence was presented that Defendant lived at the residence where methamphetamine, marijuana, and a digital scale were found, and that these items were found in plain view in Defendant's kitchen and living room, both common areas in the residence where Defendant had routine access. Additionally, Father testified that Defendant had routine access to the shed where Defendant worked on vehicles. Numerous items used in manufacturing methamphetamine, including a plastic container of marijuana baggies, a fuming hydrochloric gas generator, the coffee grinder with pseudophedrine residue, and a salt con-

tainer filled with lithium batteries, were found in the shed.

Furthermore, Defendant was implicated by his girlfriend, who admitted to police that she and Defendant had snorted methamphetamine earlier the same day from a plate, which the police found still containing methamphetamine and a snort tube. The plate also contained two clear baggies of marijuana, and one small green plastic bag with a white powdery substance. Deputy Power also observed Defendant's behavior as consistent with someone who had taken drugs because he "appeared to be, what we call, tweaking. He was nervous, agitated, fidgeting, a lot of eye movement, wasn't stringing a lot of things together. When he would talk, he couldn't stand still, very agitated."

Additional incriminating evidence that supports an inference of Defendant's knowledge and control of the contraband in question includes Klingele's testimony that she and the children on the bus smelled a strong odor coming from Defendant's car, which the police officers also smelled when Defendant arrived at his residence. Last but not least, important are the Wal–Mart receipts found in the master bedroom, containing both male and female clothing. Notably, one of the Wal–Mart receipts had Defendant's name on it, indicating that Defendant used his credit card to make a purchase of items used in manufacturing methamphetamine, and matching some of the items found around Defendant's residence.

The totality of the evidence presented at trial is sufficient to allow an inference of Defendant's knowledge and control of the controlled substances and the materials used to manufacture methamphetamine that were found in and about Defendant's home. The evidence demonstrating Defendant's constructive possession of the contraband was substantially greater than the evidence offered by the State in *Withrow*. The evidence presented at trial was sufficient to support the jury's decision that Defendant had the purpose to manufacture methamphetamine, and that he attempted to do so by taking the substantial steps of purchasing at Wal–Mart many items used in the manufacturing process, and retaining control over those items through his routine access to them throughout his residence.

Accordingly, consistent with the statutory elements of the charges brought against Defendant, the evidence at trial was sufficient from which a jury could have found, beyond a reasonable doubt, that Defendant was guilty of attempt to manufacture methamphetamine, as well as possession of a controlled substance with intent to distribute.

The trial court did not err in denying Defendant's motion for judgment of acquittal at the close of the evidence. Point I is denied.

### Point II—Attempt to Manufacture Methamphetamine Improperly Classified

Defendant argues in his second point that the trial court erred in misclassifying Count II as a class A felony instead of a class B felony. Defendant contends that while his prior and persistent offender status allowed the range of punishment for his offense to increase as a result of such a finding, the class of the felony of which he was convicted remained the same.

#### Plain Error Standard of Review

Defendant's point is not properly preserved because Defendant did not object to the classification of Count II as a class A felony prior to this appeal. Where a point is not properly preserved, plain error review is discretionary where a manifest injustice or miscarriage of justice has result-

ed. Rule 30.20; *State v. Tisius,* 92 S.W.3d 751, 767 (Mo. banc 2002).

> If in applying this standard the appellate court chooses to exercise its discretion to conduct plain error review, the process involves two steps. First, the court must determine whether the trial court actually committed evident, obvious and clear error that affected substantial rights.... [I]n the second step of reviewing for plain error, the court must determine whether the evident, obvious, and clear error found resulted in manifest injustice or a miscarriage of justice.

*Cohen v. Express Fin. Servs., Inc.,* 145 S.W.3d 857, 864 (Mo.App. W.D.2004). We will review Point II for plain error.

### Discussion

■ Defendant claims the trial court plainly erred in classifying his Count II conviction for attempt to manufacture methamphetamine as a class A felony instead of a class B felony. We agree.

Defendant was charged with attempt to manufacture methamphetamine as a class B felony. Section 195.211 defines attempt to manufacture methamphetamine as a class B felony unless the attempt to manufacture is done near a school or school bus. These facts were not charged nor proven in Defendant's case. Further, Defendant was punished as a prior and persistent offender, which increases the range of punishment, but does not increase the classification of the offense. Section 195.291.1; Section 558.016.7. *See also State v. Riley,* 213 S.W.3d 80, 93 (Mo.App. W.D.2006).

Defendant's sentence and judgment reflects that for his second count, he was charged under Section 195.211, attempt to manufacture methamphetamine as a class B felony; however, the sentence and judgment also states "Felony A" for that count. We find the sentence and judgment unin-

tentionally reflects the incorrect classification for the crime, and that the original charge and discussions during sentencing correctly reflects the crime's classification, a class B felony. We remand Defendant's case to correct this clerical error in the court's judgment. *State v. Johnson,* 220 S.W.3d 377, 385 (Mo.App. E.D.2007). Defendant's second point is granted.

### Point III—Forfeiture of Bond was Abuse of Discretion

#### Procedural History

On December 19, 2005, Father posted a $100,000 cash bond on behalf of Defendant. In a three-page form titled "Appearance Bond and Notice," the trial court set forth Defendant's conditions of bond as well as the consequences for Defendant's failure to follow those conditions. The court signed and dated this order on December 19, 2005. The Bond Conditions state that Defendant is required to:

1. Attend all court hearings as set by this Court or any court to which the case is transferred or appealed....

2. Submit to any orders, judgments and sentence of this Court or any court hearing this case.

3. Inform the Court of any change of address.

Additionally, the following "Other Conditions" were designated as pertaining to Defendant on the Appearance Bond and Notice:

a. Defendant shall not tamper with a witness or victim nor allow another person on his behalf to tamper with a witness or victim as described below at end of this form.

b. Defendant shall obey all laws and ordinances.

c. Defendant shall reside at the address listed above on this form.

d. Defendant shall not consume or possess any alcohol or drugs other than prescription drugs taken according to the prescription.

e. Defendant will submit to any drug or alcohol testing as required by a law enforcement officer.

f. Defendant is to consent to request of any law enforcement officer to search of person, premises or vehicle.

g. Defendant will not associate with any person who has been convicted of or pled guilty to a drug or alcohol offense.

j. Defendant must not possess a firearm.

The Appearance Bond and Notice specifically notes that Defendant understands that the consequences for failure to follow any of the listed conditions include:

1. **Forfeit any cash or securities deposited with the Court.**

2. The Court has the authority to sell the Defendant's property to collect the full amount of the bond.

3. If the Defendant fails to abide by condition 1, a warrant will be issued for his/her arrest. In addition to the above charges, a charge of failure to appear may be filed.

(emphasis added).

Defendant signed and dated the Appearance Bond and Notice on December 19, 2005. This form also includes a notice and acknowledgement for the person posting the bond, which was signed by Father and dated December 19, 2005. Specifically, the notice and acknowledgement reads:

When posting a cash bond (10% deposit bonds included), the receipt will be made in the name of the Defendant. **Any money posted will be considered by the Court as belonging to the Defendant. By depositing this cash, you are relinquishing any claim you may have to the bond money.** In the event the Defendant is found guilty of the offense(s) with which he/she is charged, all assessments against the Defendant, such as fines, court costs, board bill, public defender fees, legal fees for appointed attorneys, and crime victim compensation fund judgments in this case or other cases will be deducted from the cash bond money refunded to the Defendant. You may claim any refundable money at the conclusion of the charges only if the Defendant has properly assigned his/her bond receipt to you. If the Defendant does assign his/her bond receipt to you, the assignment will be effective only after it has been properly filed with the Lewis County Circuit Court.

I have read the above notice, understand that all assessments for fines, court costs, public defender fees, legal fees for appointed attorneys, crime victim compensation fund judgments, and other fees may be deducted from the money deposited as the bond in this case. I further understand and acknowledge that I relinquish any claim to these funds.

(emphasis added).

The Appearance Bond and Notice contains a section designated "For Persons Other Than the Defendant Who Post (Bondsman/Surety)." Father did not sign this section of the Appearance Bond and Notice, which remains blank and unsigned. This section contracts an assumed custody for the defendant, and agrees that the defendant will appear and abide by the conditions of bond set forth therein. Additionally, this section states that "[i]f Defendant fails to do so, I understand that I or the company I represent must forfeit or pay the full amount of the bond or it will be levied against my property or estate or the property of the company I represent."

On March 22, 2006, the State filed a motion to revoke and forfeit the cash bond. In its motion, the State alleged that Defendant violated his conditions of bond as follows:

(a) On January 14, 2006, in Lewis County, Missouri, defendant exceeded the posted speed limit by driving 88 miles per hour when the posted speed limit was 55 miles per hour.

(b) On January 14, 2006, in Lewis County, Missouri, the defendant violated the law by resisting arrest for a misdemeanor by fleeing in Lewis County, Missouri.

(c)-(e) The defendant violated the law on March 13, 2006, in Adams County, Illinois, by committing the offense of unlawful possession of methamphetamine . . . . unlawful possession of a controlled substance . . . . [and] unlawful possession of cannabis.

(f)-(g) The defendant violated the law on March 15, 2006, in Lewis County, Missouri, by committing the offense of the class C felony of receiving stolen property . . . . [and] the class C felony of possession of a controlled substance.

(h) The defendant violated the law on December 21, 2005, by failing to drive on the right half of the roadway when the roadway was of sufficient width.

Further, the State alleged that Defendant violated the condition that he "shall not consume or possess any alcohol or drugs other than prescription drugs taken according to the prescription" in the following manner:

(a)-(c) On or about March 13, 2006, in Adams County, Illinois, the defendant possessed methamphetamines, a controlled substance . . . . possessed Tylenol # 3, a schedule 2 controlled substance without a prescription . . . . [and] possessed cannabis, a controlled substance.

(d) On or about March 15, 2006, in Lewis County, Missouri, the defendant possessed methamphetamines, a controlled substance.

The State alleged that Defendant's continued violation of the law and conditions of his bond show that Defendant is a danger to the community and make him a flight risk.

The court held a hearing on the State's motion on April 13, 2006. The court sustained the State's motion to revoke and forfeit the cash bond and entered judgment of forfeiture. The court further docketed Defendant's requested release of the deposited bond funds, and took Defendant's request under advisement.

On May 4, 2006, the State filed a motion requesting the circuit court to enter a judgment of default and execution on the forfeiture. The court held a hearing on the State's motion after sentencing. A transcript of the hearing is included in the record. After hearing the parties' arguments, the court entered a judgment of default on the bond. The trial court found that Father was not a surety, noting that Father acknowledged the same by signing an Appearance Bond and Notice, which expressly states that any money posted for the bond belonged to Defendant, and that Father relinquished any claim he may have to Defendant's bond money. Defendant claimed Father was a surety, and sought return of the bond under Rule 33.13 because Defendant made all court appearances. The trial court considered the State's Motion to Revoke and Forfeit Bond under Rule 33.14, and, rejecting Defendant's argument, stated that the terms of the written bond, notice and acknowledgment make it "abundantly clear that the money becomes the Defendant's posting in a cash bond." Thus, the trial court found that "justice requires the forfeiture of defendant's bond in this instance . . ." The trial court entered a default judgment

against Defendant, and ordered the $100,000 bond forfeited and paid into the Lewis County School Fund pursuant to Article 9, Section 7 of the Missouri Constitution.

### Standard of Review to Set Aside Judgment

An appeal from a request to set aside a judgment of a bond forfeiture is governed by the sound discretion of the trial court. Rule 74.06; *Gering v. Walcott,* 975 S.W.2d 496, 498 (Mo.App. W.D.1998). We will affirm an order denying a motion to set aside a judgment unless substantial evidence does not support the judgment, the judgment is against the weight of the evidence, or the judgment erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976).

### Discussion

#### Father Not a Surety

 Defendant argues in his third point on appeal that the trial court erred in holding that the $100,000 bond posted by Father belonged to Defendant rather than Father in the capacity of a surety. Defendant contends that the parties agreed that Father was a surety, and therefore the $100,000 belonged to Father at the time of the hearing on the State's motion to revoke and forfeit the cash bond. We disagree.

The status and rights of Father in relation to the bond money is determined by the Appearance Bond and Notice signed by Father at the time he posted the $100,000 bond. Any arguments made by the State in conjunction with the State's motion to revoke Defendant's bond could not transform the cash bond and written Appearance Bond and Notice into a surety agreement.

Defendant argues that no facts exist to support the trial court's finding that Father was not a surety, and that the court abused its discretion in ruling that Father was not a surety based on the language in the written bond agreement. Defendant claims that Father is entitled to the return of the $100,000 bond because Defendant appeared at all court dates, which is the purpose of a bail bond. Defendant further argues that Lewis County's ability to condition the issuance of bonds to defendants and seek forfeiture of said bonds upon the failure of such conditions does not "strip sureties of their statutory right to surrender the defendant and move for forfeiture to be set aside." While we are sympathetic to Father's circumstances, we cannot ignore the plain facts of this case and Missouri case law, which are at odds with Defendant's matter-of-fact contention, without sound legal analysis, that Father is a surety.

To the contrary, we find instructive the review and analysis of the rights and obligations of persons posting statutorily authorized cash bonds, the rights and obligations of bail bondsmen and sureties under the common law, and the propriety of conditions placed upon the issuance of cash bonds set forth in *State v. Echols,* 850 S.W.2d 344 (Mo. banc 1993) and *Perry v. Aversman,* 168 S.W.3d 541, 545–46 (Mo.App. W.D.2005). The analysis provided in *Echols* and *Perry* leads us to conclude that Father was not entitled to the rights of a bail bondsmen or surety given the facts of this case.

In *State v. Echols,* 850 S.W.2d 344 (Mo. banc 1993), the Missouri Supreme Court clearly held that a person posting a cash bond is not a surety. In *Echols,* the defendant's grandfather and uncle (the Kellermans) paid defendant's $100,000 bail with a cashier's check and were told at the time they paid the $100,000 that a cash bond

could be posted only in the name of the defendant. *Id.* at 345. The defendant assigned the bond receipt to the Kellermans by signing the assignment form on the back of the bond receipt. *Id.* At the time the bond was posted, the Kellermans received notice that *any money posted would be considered by the Court as belonging to the defendant and that the Kellermans were relinquishing any claim they may have to the bond money. Id.* (emphasis added). While the notice allowed the Kellermans to claim any refundable money at the conclusion of the charges if defendant assigned his bond receipt to them, the notice also stated that any assessments against the defendant would be deducted from the cash bond before any money was refunded if the defendant was found guilty. *Id.* The defendant's grandfather signed the form and acknowledged that he read and understood the notice. *Id.*

The defendant in *Echols* was present for all of his court appearances before and during trial, but failed to appear after the trial court mistakenly allowed the defendant to remain free on the $100,000 cash bond following a returned guilty verdict. The day after the trial had concluded, the trial court revoked defendant's bond when it realized it had no authority to continue the defendant on bond. The Kellermans filed a motion to intervene, seeking to set aside the order revoking the bond. The trial court denied the Kellermans' relief and entered an order forfeiting the bond. *Id.* at 346. On appeal, the Kellermans argued that they were not given the right to act as sureties and that as sureties, they were entitled to the return of the money posted as bond because the defendant had appeared for trial. *Id.*

After carefully reviewing the history and treatment of cash bail and bail bondsmen under both common law and statute, the *Echols* court concluded that a person posting a cash bond is not a surety because the defendant's appearance under a cash bond was assured by the cash held by the court, and not by any promise by a surety to pay money in the future if the defendant does not appear. *Id.* at 346–48. The court distinguished the statutorily created "cash bail" from the rights, duties and obligations of bail bondsmen, which originate under English common law. *Id.* The cash, which provided the reason for the defendant to appear, is presumed property of the defendant, even when supplied by a third party. *Id.* at 347. Accordingly, the *Echols* court held that the Kellermans were not sureties, had no rights or obligations of a surety, and assumed their risks when they posted the cash bond. *Id.* The court further held that the notice and acknowledgment signed by the grandfather was wholly consistent with the law when it stated that any money deposited would be considered as belonging to the defendant. *Id.* at 348 n. 4.

Certain facts between *Echols* and the case before us are strikingly similar. Here, as in *Echols,* Father, a third party, posted a $100,000 cash bond on behalf of Defendant, and signed the Appearance Bond and Notice wherein Father expressly acknowledged that he relinquished any claims he may have to the cash deposited with the court. As in *Echols,* Father acknowledged that the $100,000 cash bond was subject to forfeiture upon Defendant's failure to meet the conditions of his bond. As in *Echols,* Defendant's appearance was assured by the $100,000 cash held by the court, and not by any promise by a surety to pay money in the future if Defendant failed to appear. Based upon the record before us, we conclude that the trial court did not err in finding that Father was not a surety given the clear language of the Appearance Bond and Notice that both Father and Defendant signed.

### Defendant Had Notice of his Conditions of Bond Forfeiture

■ Our inquiry into the trial court's actions forfeiting Defendant's bond does not end with our finding that Father is not a surety. Our analysis continues to determine if the trial court abused its discretion in ordering the bond forfeiture under Missouri statutes and Rule 33.14.

Sections 544.455 and 544.457 authorize a court to set conditions of a defendant's release on a bailable offense. Section 544.455 allows the imposition of conditions "which will reasonably assure the appearance of the person for trial." Section 544.455.1. This statute lists various conditions that may be placed upon the released defendant by the court such as travel restrictions, associational restrictions, reporting requirements, or "any other condition deemed reasonably necessary to assure appearance as required." Section 544.455.1(6). While Section 544.455.2 sets forth various factors for the court's consideration when imposing conditions that will reasonably assure a defendant's appearance, a promise to "obey all laws and ordinances" or "not to consume any alcohol or drugs" are not factors found within this sub-section. The absence of such reference is consistent with the limitation that any conditions imposed under Section 544.455 must be "reasonably necessary to assure [the defendant's] appearance." Section 544.455.1(6). While a defendant's promises to obey the law and refrain from alcohol and drug usage serve to benefit society, such promises are not reasonably related to a defendant's promise to appear in court, and are conditions that the trial court was not authorized to impose under Section 544.455.

Section 544.457 authorizes the court to set "special conditions" of a defendant's release upon a showing that the defendant poses a danger to the crime victim, the community or any other person. The broad conditions imposed by the trial court, if permissible under Missouri's statutory scheme, must fall within the "special conditions" allowed under this statute and Rule 33.14, which allows the court to enter a judgment of forfeiture where the defendant violates a condition of his bond. Contrary to Defendant's argument, we agree with the State that neither the statute nor the rule limit bond forfeitures only to instances where a defendant fails to present himself for a court appearance.

In *Perry v. Aversman,* 168 S.W.3d 541 (Mo.App. W.D.2005), the Western District considered the issue of bond conditions.[5] In *Perry,* the Western District acknowledged that the primary objective of posting a bail bond is the appearance of the defendant at his trial proceedings, and that the money on deposit will be returned if the defendant appears at all times. *Id.* at 545. However, the court further recognized that this same procedure allowed conditions to be contained within the bond that required the defendant to comply with orders of the court. *Id.* "Although case law and tradition indicate the primary purpose and condition of bail bonds and cash bail bonds is to reasonably assure the presence of the accused in court until the final disposition of the case, the trial court may impose additional conditions before releasing the defendant on bond, such as for subsequent payment of costs and fines." *Id.* at 545–546. The ultimate question for the *Perry* court was whether the persons posting the bond were given adequate notice that fines and costs may be

---

**5.** Although *Perry* did not involve a bond forfeiture pursuant to Rule 33.14, we find instructive the court's discussion of a trial court's authority to impose conditions before releasing a defendant on bond.

deducted before the deposit was returned. The *Perry* court found that persons posting the bond were not given sufficient notice. *Id.*

Like the court in *Perry*, we also acknowledge that a trial court in its discretion "may impose additional conditions before releasing the defendant on bond, such as for subsequent payment of costs and fines," and that "specific language to that effect must be made a part of the conditions of the pre-release bond or, at a minimum, an acknowledgment thereof made by the defendant, or person posting the cash deposit." *Id.* at 546. We consider Defendant's claims in light of these requirements.

First, we cannot conclude that the conditions contained in Defendant's bond relating to obeying all laws and ordinances and refraining from the consumption of alcohol and drugs are unreasonable or are unrelated to a showing that Defendant poses a danger to the community under Section 544.457. To the contrary, such conditions appear rationally related to the legitimate goal of protecting the community from a person charged with the crime of possession with the intent to manufacture methamphetamine, a drug that has spread like a destructive and debilitating cancer throughout Missouri. In addition, as noted above, Defendant's bond form included a written notice and acknowledgement of not only the conditions of Defendant's bond, but of the forfeiture provisions should Defendant not meet any of the conditions. This written notice and acknowledgment was signed by Father and dated December 19, 2005. The record before us shows that there is no genuine dispute of the fact that Father had sufficient notice of the conditions of Defendant's bond, including that the cash bond receipt would be made in the name of Defendant and that any money posted would be considered belonging to Defendant. Additionally, there is no factual dispute that Father had written notice that he relinquished any claim he may have to the bond money, and that assessments against Defendant could be deducted from the cash bond money refunded to Defendant. The facts are not disputed that Father had written notice that he could only claim the money refunded if Defendant properly assigned him the bond receipt, and that Defendant here did not execute any assignment. Finally, the facts are not disputed that both Defendant and Father had written notice that Defendant must meet several conditions in addition to appearing in court in order to ensure the refund of his bond, including obeying all laws and ordinances and avoiding consumption or possession of any alcohol or drugs.

In sum, the trial court was authorized to impose conditions upon Defendant's bond. Furthermore, and distinguished from *Perry*, in which the persons posting the bond were not given sufficient notice of the fines and costs that may be deducted, here, Defendant had sufficient notice of his bond's "special conditions," of which a breach may allow the court to enter a judgment of forfeiture.

*Does Justice Require Forfeiture of Defendant's Bond?*

██ Although we find that the trial court was authorized to impose conditions on Defendant's bond, our analysis of the trial court's actions is not complete. We must still consider whether the trial court abused its discretion when it issued its judgment and execution on Defendant's forfeiture of bond under Rule 33.14.

"Missouri provides a very narrow remedy to one having a financial interest in the subject matter of the forfeiture of a bail bond. 'The court may direct that a forfeiture be set aside, upon such conditions as

the court may impose, if it appears that justice does not require the enforcement of the forfeiture.'" *Echols*, 850 S.W.2d at 348, *citing* Rule 33.14. Our review of the trial court's decision whether to set aside the forfeiture is necessarily limited to whether the trial judge abused discretion. *Id.*

In its Judgment of Default and for Execution on Forfeiture of Bond, the trial court found that "justice requires the forfeiture of defendant's bond in this instance ..." The record before us provides absolutely no support for the trial court's finding. The trial court made no findings of fact relating to the alleged violations of Defendant's bond conditions, and made no findings to support its conclusion that "justice requires" the bond forfeiture. All we can conclude from the record and the trial court's order is that the State alleged Defendant violated his conditions by committing various criminal offenses and possessing alcohol and/or drugs while free on bond and filed supporting documentation with its Bond Revocation and Forfeiture Memorandum. At most, the record contains only allegations that Defendant violated the conditions of his bond, nothing more. The record contains no documentation of the alleged violations.[6] Moreover, because the purpose of the bond conditions imposed under Section 544.457 is to pro-

tect the community or any other person from the dangers posed by the defendant, we fail to understand how the forfeiture of Defendant's bond *after* Defendant has been sentenced to 20 years in the Missouri Department of Corrections serves to promote justice in Lewis County or any other part of this State.[7]

We recognize the fact that there is limited case law addressing bond forfeitures under Section 544.457. Despite the lack of substantial guidance from other judicial authority, the facts before us lead us to the conclusion that the trial court's Judgment of Default and for Execution on Forfeiture of Bond was premised upon something other than the requirements of justice as is the dictate of Rule 33.14. While we find that the trial court was authorized to impose conditions upon Defendant's bond, we further find that the trial court abused its discretion in forfeiting Defendant's bond.

According to the plain terms of the bond agreement, Father was not a surety. Defendant was notified and acknowledged that he must obey all laws and not possess illegal drugs or alcohol as conditions of his bond to protect the community. However, the record is void of any evidence that Defendant violated the conditions of his bond, and there is no evidence to support the trial court's statement that justice required the forfeiture of Defendant's bond.

---

**6.** We note that the forfeiture of a bond is a taking of property which raises due process considerations under Article I Section 10 of the Missouri Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. Of particular concern to us is the level of proof required under due process to prove a violation of bond conditions before a bond may be forfeited. Because the facts of this case lead us to reverse the trial court's order and judgment on other grounds, we are not required to render a due process analysis. However, we remain concerned that the record before us provides no indication of the level of proof required by the trial court to

prove the alleged violations of conditions that were the basis of the bond forfeiture.

**7.** The State also asserted in its motion to revoke Defendant's bond that Defendant was a flight risk, which would come within the purview of Section 544.455. However, at the time the trial court entered its default judgment, Defendant had made all court appearances, and was already in the custody of the Department of Corrections. Given these facts, we fail to comprehend how the forfeiture of Defendant's bond could serve the purpose of assuring Defendant's appearance at court proceedings.

The trial court abused its discretion in issuing its Judgment on Default and Execution on Forfeiture of Bond. Point III is granted.

### Conclusion

We affirm Defendant's conviction and sentence, and remand the case to correct the clerical mistake in Defendant's sentence and judgment. Additionally, we reverse the trial court's Judgment on Default and Execution on Forfeiture of Bond and remand for orders consistent with this ruling.

GLENN A. NORTON, J., Concurs in result in separate opinion.

PATRICIA L. COHEN, J., Concurs.

GLENN A. NORTON, Judge, concurring.

I concur in the result of the majority opinion, but write separately to address concerns over the application of Rule 33.14 [1] to forfeit a cash bond in a case such as this, where the defendant never failed to appear when directed to do so.

## A. Background

The facts are clear. In December 2005, the defendant's father posted a $100,000.00 cash bond so that his son could be released from jail pending the resolution of the charges against him.[2] The bond required the defendant to attend all court hearings set by the trial court or any court to which his case was transferred or appealed. The bond also imposed special conditions on the defendant, including a requirement that he "shall obey all laws and ordinances."

The defendant never failed to appear when directed. Nevertheless, on March 22, 2006, the state filed a motion seeking revocation of the defendant's right to remain free on bond *and* forfeiture of the cash bond. The state alleged in this motion that the defendant had not complied with the special conditions of bond because he committed multiple law violations over a four-month period.

The court sustained the state's motion to revoke and forfeit the cash bond on April 13, 2006. On this same date, defense counsel moved that the forfeiture of the bond funds be set aside, requesting release of the $100,000.00 cash that the father had posted. The court took that motion under advisement. The defendant remained in jail until his jury trial nine months later in January 2007. *After* defendant's sentencing took place on March 6, 2007, approximately one year after the state filed its motion to revoke and forfeit the cash bond and after the defendant had been confined for almost as long, the court denied defendant's motion to set aside forfeiture of the bond, making a finding that "justice requires" the forfeiture of the defendant's bond.

## B. "Justice" under Rule 33.14 Cannot Require or Allow the Forfeiture of the $100,000.00 Bond in this Case

It was certainly appropriate for the trial court to revoke the defendant's right to remain free on bond based on the state's allegations that defendant committed multiple law violations. But the forfeiture of

1. All references to Rules are to Missouri Supreme Court Rules (2008).

2. Although the practice of requiring one who posts a cash bond to sign a form declaring the cash to be the property of the defendant from that point forward—seemingly a statement by the trial court that a third party cannot actually post the bond unless he is willing to call it a gift to the defendant—is troublesome, my concerns do not rest with the approval of such a practice by the majority.

the $100,000.00 cash in this case was not. At the time of the forfeiture, the defendant had already been sentenced to serve a lengthy term in the Department of Corrections, and did not pose a present threat to the public.

Almost a year before sentencing, the defendant moved that the forfeiture of the bond funds be set aside. The court took that motion under advisement, and denied it *after* sentencing. Rule 33.14 addresses a trial court's decision to set aside a forfeiture, stating that the court may direct that a forfeiture be set aside "if it appears that justice does not require the enforcement of the forfeiture." There is very little about the forfeiture in this case that feels or looks like "justice." Unlike the defendant in *State v. Echols,* 850 S.W.2d 344 (Mo. banc 1993), the only case cited in the majority's analysis that is binding precedent, the defendant in this case *never* failed to appear. Moreover, it looks very much like the defendant has been required to pay a $100,000.00 fine by the Circuit Court of Lewis County because of an allegation he committed crimes that are not the subject of this case.[3]

I agree with the due process concerns raised in footnote 6 of the majority opinion. But I would also hold, in a case such as this where the defendant never failed to appear as required but violated only special conditions of his release on bond, that "justice" cannot require—or allow—the forfeiture of a cash bond. Revocation of the defendant's right to remain free on bond was warranted and understandable in

this case. The taking of the $100,000.00 posted by his father was not.

---

**3.** Defense counsel should use caution when advising those considering posting bond for a defendant in a criminal case. Based on the majority opinion, the question "Can I lose the money I post as bond?" can no longer be answered with a simple, "Not if the defendant appears for all his court dates." A bond posted to secure the appearance of a defendant in a criminal case now also seems to serve as an assurance that the defendant will not violate any special conditions imposed on a bond, which may include a requirement that the defendant "obey all laws and ordinances."